

# 1654776 Ontario Limited v. Stewart, 2013 ONCA 184 (CanLII)

Date:        2013-03-27
Docket:      C55493
Other
citation:    114 OR (3d) 745
Citation:    1654776 Ontario Limited v. Stewart, 2013 ONCA 184 (CanLII), <http://canlii.ca/t/fwq57>,
             retrieved on 2016-09-08

---

## COURT OF APPEAL FOR ONTARIO

CITATION: 1654776 Ontario Limited v. Stewart, 2013 ONCA 184
DATE: 20130327
DOCKET: C55493

Laskin, Juriansz and Tulloch JJ.A.

BETWEEN

1654776 Ontario Limited

Applicant (Appellant)

and

Sinclair Stewart and The Globe and Mail Inc.

Respondents (Respondents)

Paul Bates, A. Dimitri Lascaris, Douglas M. Worndl and Robert L. Gain for the appellant

Peter M. Jacobsen, Paul LeVay, Tae Mee Park, and Justin Safayeni for the respondents

Heard: September 17, 2012

On appeal from the judgment of Justice Edward P. Belobaba of the Superior Court of Justice, dated April 20, 2012, with reasons reported at 2012 ONSC 1991 (CanLII).

**Juriansz J.A.:**

## A. INTRODUCTION

[1] This appeal is from the judgment of Justice Edward P. Belobaba dismissing the appellant's application for an order that the respondents disclose the identities of confidential sources for a story written by the respondent Sinclair Stewart and published by the respondent the Globe and Mail Inc. The appellant, whose sole officer, director and shareholder is Jeffrey G. MacIntosh, holder of the Toronto Stock Exchange Chair in Capital Markets Law at the University of Toronto Law School, seeks their identities to proceed with a proposed class action relying on the provisions of the *Securities Act*, R.S.O. 1990, c. S.5, that create private rights of action.

[2] The law regarding the type of relief the appellant sought, a "*Norwich* order", originated in *Norwich Pharmacal Co. v. Comrs. of Customs and Excise*, [1974] A.C. 133, and was most recently considered by this court in *GEA Group AG v. Ventra Group Co.*, 2009 ONCA 619 (CanLII), 96 O.R. (3d) 481. Cronk J.A. explained the origin and nature of the remedy at para. 41:

> The remedy of pre-action discovery derives from the ancient bill of discovery in equity. Contemporary consideration of this type of equitable relief began with the 1974 decision of the House of Lords in *Norwich Pharmacal*, a case of suspected patent infringement. *Norwich Pharmacal* holds that, in certain circumstances, an action for discovery may be allowed against an "involved" third party who has information that the claimant alleges would allow it to identify a wrongdoer, so as to enable the claimant to bring an action against the wrongdoer where the claimant would otherwise not be able to do so.

[3] The appellant's *Norwich* application has to be considered in the context of the respondents' claim of journalist-source privilege. The respondents' claim of privilege must be determined by the four-part Wigmore test for establishing journalist-source privilege as set out in the Supreme Court's decision in *R. v. National Post*, 2010 SCC 16 (CanLII), [2010] 1 S.C.R. 477.

[4] The application judge regarded the appellant's proposed claim as serving private interests and concluded it had little merit and would likely fail. Consequently, he found the public interest in preserving journalist-source privilege outweighed any interest in the appellant's claim.

[5]    I would dismiss the appeal. The appellant has put forward a claim that, except for the respondents' claim of privilege, would entitle it to disclosure. The apparent strength of the case, however, is weak. The public interest in free expression must always be weighed heavily in the balance. Upholding the privilege would not leave the appellant without a remedy. It can proceed against the companies involved. The public interest in promoting compliance with the disclosure regime regulated by the *Securities Act* can be adequately served without granting disclosure.

## B.   FACTS

[6]    The appellant brought its application for a *Norwich* order on March 31, 2011. The application was not heard until March 21-23, 2012. Meanwhile, the appellant filed a statement of claim against BCE Inc., 6796508 Canada Inc. ("Canada Inc.") and John or Jane Doe on June 27, 2011, and amended it on March 20, 2012.

[7]    In the action, the appellant seeks $30 million in general damages and $5 million in punitive damages arising from fluctuations in the price of BCE shares over a four-day period during the attempted leveraged buy-out of BCE in 2007-2008. BCE announced the leveraged buyout in a press release dated June 30, 2007. The press release stated that BCE had entered into an agreement with Canada Inc. for the acquisition of all of BCE's common shares by means of an all-cash bid of $42.75 per share.

[8]    In compliance with the requirements of the Ontario *Securities Act* BCE filed a material change report dated July 5, 2007 concerning the transaction and describing the future events that could affect its completion, including financing covenants, regulatory approvals, and conditions precedent.

[9]    Ultimately on June 20, 2008, after proceedings that reached the Supreme Court of Canada, the courts approved the transaction. BCE and Canada Inc. issued a joint public statement confirming their continued commitment to the transaction.

[10]   On June 30, 2008 the Globe and Mail published a story in its business section that the buyout would likely be delayed, if it proceeded at all. The Globe and Mail's story reported information supplied by the confidential sources. In the lead paragraph, Stewart wrote:

> [The] problem-plagued $35 billion takeover of BCE Inc. will likely be delayed until the end of the year owing to the increasingly fractious negotiations between the company's private equity buyers and a syndicate of lenders who are pushing to lower the value of the buyout, according to people involved in the negotiations.

[11]   Stewart then went on to provide a more detailed discussion, which included references to confidential sources who were "at the bargaining table" and "participating in negotiations":

Sources close to the talks say the banks financing the deal are balking at the proposed purchase price of $42.75 a share, and are instead insisting that the company should be valued on the same basis as rival Telus Corp., which would imply a steeply discounted price of between $35 and $38 a share.

Although the two sides are still talking, several sources described the tenor of the discussions as grinding and suggested that the parties remained far apart on a number of key issues.

'Everyone has underestimated when this deal gets done,' said one executive at the bargaining table. 'It's Christmas'.

The source added he did not think the buyers and the banks would reach an agreement over the financing terms this summer, if at all.

Sources say given the current uncertainty around the acquisition, there is almost no chance BCE will pay out [its $294 million quarterly dividend].

Two high-level sources, one at BCE and another that is participating in negotiations, insisted that the company's embattled board had little appetite for lowering the price of the offer.

'They're at $42.75 and damn the torpedoes,' said one of the sources.[1]

[12]    Stewart, on cross-examination, indicated that the "high-level" source at BCE was privy to the BCE board negotiating position and that the source consented to being identified as being with BCE.

[13]    The appellant claims that on the trading day following the publication of the article, the price of BCE shares fell 3.3% and the market price of BCE call options fell precipitously. On July 2, 2008 the appellant disposed of BCE shares and BCE call options at a loss of $35,900.

[14]    On July 4, four days after the article was published, BCE issued a press release announcing that a "final agreement" had been achieved and the transaction would proceed at the purchase price of $42.75 per share. After the July 4 announcement, the appellant claims the shares jumped from $35.15 to $39.50, about 12%; and the call options from $0.17 the day before to $1.90, an increase of over 1000%.

[15]   Ultimately the transaction did not proceed.

[16]   The appellant believed that the confidential sources had breached the Ontario *Securities Act*. MacIntosh wrote to and spoke with enforcement officers of the Ontario Securities Commission attempting to prompt it to commence a formal investigation. He wrote two op-ed pieces in the *National Post* opining that the OSC should investigate the possible manipulation of the options market during the failed BCE bid.

[17]    With a view to commencing an action, the appellant requested that Stewart and the Globe and Mail provide him with the identities of the unnamed sources quoted in the article, but they refused to do so. The appellant then brought its *Norwich* application and then issued its statement of claim.

[18]   The defendants named in the claim are BCE, Canada Inc., and John or Jane Doe. Among other relief, the action claims a declaration that the defendants breached s. 76, s. 126.1, and/or s. 126.2 of the Ontario *Securities Act*. Section 76(2) prohibits a person "in a special relationship with a reporting issuer" from informing another person of "a material fact or material change with respect to the reporting issuer before the material fact or material change has been generally disclosed." Section 126.1 prohibits a person from perpetrating a fraud on any person or company. Section 126.2 prohibits a person from making a misleading or untrue statement that would reasonably be expected to have a significant effect on the market price or value of the security.

[19]   The statement of claim alleges that the statements made by Doe to Sinclair and attributed to Doe in the story "were false and/or materially misleading". The claim alleges that Doe made the statements for tactical reasons in the negotiations and the statements were not intended to be a true and accurate description of the status of the transaction.

[20]    The claim goes on to allege that the appellant, relying on the false and/or materially misleading statements, disposed of its shares and call options at prices artificially depressed by the story. The claim asserts that the prices rebounded sharply four days later, when BCE announced by press release that a final agreement had been reached.

[21]   The statement of claim seeks to assert the rights of action provided for in s. 138.3(2), (3) and (4) of Part XXIII.1 of the Ontario *Securities Act* relating to "civil liability for secondary market disclosure". Section 138.3(2) creates a right of action for damages when a person with actual, implied or apparent authority to speak on behalf of a responsible issuer has made a public oral statement relating to the business or affairs of the responsible issuer that contains a misrepresentation. Section 138.3(3) creates a right of action for damages when an "influential person" has made a public oral statement relating to the business or affairs of a responsible issuer that contains a misrepresentation. Section 138.3(4) creates a right of action

for damages against a responsible issuer for the failure to make timely disclosure of material changes required to be disclosed under the Act.

[22]    As provided by s. 138.8(1), actions under s. 138.3 cannot be commenced without leave of the court "granted upon motion with notice to each defendant." Since the appellant is unable to give notice to John or Jane Doe, the statement of claim filed indicates the appellant intends to bring a motion for leave under s. 138.8(1).

[23]    The appellant in his action also claims damages for "negligent misrepresentation". It claims that the applicable standard of care required the defendants to not make misleading or untrue statements that violated s. 126.2 of the Ontario *Securities Act*, and to not engage in illegal tipping contrary to s. 76(2).

[24]    The action also claims oppression and indicates an intention to seek certification as a class action.

## C. THE DECISION OF THE APPLICATION JUDGE

[25]    The application judge declined to grant the *Norwich* order. He noted that the *Norwich* and Wigmore analyses intersect when an applicant is seeking disclosure of confidential journalist sources. In order to obtain a *Norwich* order, the application judge stated that the applicant must show that:

(i)      it has a valid, *bona fide*, or reasonable claim; or in cases such as this one where freedom of expression[2] interests are engaged, that it has a *prima facie* case;

(ii)   the respondents are somehow involved in the acts complained of;

(iii)  the respondents are the only practical source of the information;

(iv)  the respondents can be indemnified for any costs of disclosure; and

(v)   the interests of justice favour the obtaining of the disclosure.

[26]  I explain later that the first requirement is not correctly stated.

[27]    The Wigmore framework for establishing journalist-source privilege requires that the party asserting the privilege show that:

(i)      the communication originated in a confidence that the source's identity will not be disclosed;

(ii)   anonymity is essential to the relationship in which the communication arises;

(iii)    the relationship is one which should be sedulously fostered in the public interest;

(iv)   the public interest served by protecting the identity of the informant outweighs the public interest in getting at the truth.

[28]    Having set out the legal framework, the application judge proceeded to apply the *Norwich* criteria. The respondents submitted that the appellant had not

established a *prima facie* claim under the first stage of the analysis because none of the statements was actionable and, in any event, the actions were time-barred under s. 138.14 of the *Securities Act* and s. 4 of the *Limitations Act*, S.O. 2002, c. 24, Schedule B. The application judge preferred to address the strength of the applicant's case when balancing the interests in the final stage of the *Norwich* analysis. He proceeded to "assume, without deciding" that a *prima facie* claim had been established under the first stage of the *Norwich* test.

[29]    At the final stage of the *Norwich* analysis, the application judge applied the Wigmore test for journalist-source privilege to determine whether "the interests of justice favour obtaining the disclosure." He stated, at para. 40:

> When the Norwich and Wigmore tests intersect, such as here, the Wigmore test becomes almost the entire "interests of justice" analysis that is conducted in the fifth step of the Norwich test. In other words, if the four-part Wigmore test is satisfied by the media respondents, it probably will not be in the interests of justice to order disclosure. If the Wigmore test is not satisfied at any of the four steps, it probably will be in the interests of justice to order disclosure. [Citations omitted].

[30]    The appellant argued that step one of the Wigmore test was not satisfied because Stewart failed to ask his sources why they were willing to disclose the information and whether they were aware that disclosure might violate provincial securities law. The application judge held that journalists are not required to ask these types of questions in order to establish journalist-source privilege. He relied on the Supreme Court of Canada's decision in *Globe and Mail v. Canada (Attorney General)* ("*Groupe Polygone*"), 2010 SCC 41 (CanLII), (2010) 2 S.C.R. 592, which stated at para. 84 that "[a] journalist is under no obligation to act as legal advisor to his or her source of information."

[31]    The second Wigmore criterion was satisfied because the relationship originated in a confidence that the sources' identities would not be disclosed.

[32]    The appellant took issue with the third criterion of the Wigmore test. It argued that the relationship between a deal-insider and a business journalist should not be "sedulously fostered" where the insider discloses information in a manner that breaches securities law.

[33]    The application judge rejected this argument at para. 36 saying that the concern "is the legitimacy and status of the journalist: is he or she an accredited professional or a less than credible, one-off blogger?" He continued, "Assuming the journalist can show professional standing with a legitimate news organization, the third step is readily satisfied". As authority for this conclusion, he cited Binnie J.'s remark at para. 57 of *National Post*, "[I]n general, the relationship between professional journalists and their secret sources is a relationship that ought to be sedulously fostered."

[34]     Another reason for rejecting the appellant's approach to step three, the application judge said, was because any evaluation of the content of the communication is properly addressed at step four of the analysis, not at step three.

[35]   The application judge found that step three was satisfied.

[36]   Moving to the fourth and final criterion the application judge observed at para. 37 that, "The 'weighing up' will include the nature and seriousness of the alleged wrong-doing and the probative value of the evidence sought to be obtained, measured against the public interest in respecting the journalist's promise of confidentiality."

[37]   In assessing the probative value of the evidence the application judge revisited the merits of the appellant's cause of action and engaged in a thorough analysis of the alleged *Securities Act* violations.

[38]     In support of its position that the sources' statements may have been misleading or untrue, the appellant pointed to the improbability that negotiations of this magnitude could have been collapsing on Monday and then resulted in an agreement on Friday. The application judge found this submission to be "contrary to common sense and common knowledge", as "[n]egotiations that are on the verge of collapsing on day one can and do result in an agreement on day four", at para. 46. He also found that the contents of Stewart's article were substantially similar to the information contained in articles published by other newspapers at the time. The application judge stated that it "strains credulity" to suggest that all of these articles were misleading or untrue, at para. 48.

[39]   If the information provided by the sources was true, the application judge also found that it was unlikely that the respondents' sources contravened the insider tipping provisions of the Act. In his view, the June 30 article did not contain any "material" information. The application judge found that the information in the article "was neither new nor different from what had already been published over the previous ten days" and therefore "'would not reasonably be expected to have a significant effect' on the market price of BCE securities", at para. 56.

[40]   The application judge concluded that the statements of the sources in the June 30 article were "probably not" in breach of the *Securities Act*, though they could "possibly" be in breach of the Act. He stated, at para. 42:

> In my view, none of what was said by the confidential sources was clearly or even likely in breach of provincial securities law. I find that the most that can be said about the sources' statements as published in the article is that they were *possibly* in breach of the *Securities Act*. In other words, the level of criminality or quasi-criminality at its very highest is very low – at most, there was *possible* wrong-doing. [Emphasis in original.]

[41]   The public interest in free expression and the "special position of the media" weighed in favour of protecting the sources. This was particularly important given that the BCE leveraged buy-out was a matter of national and international importance. Conversely, the public interest favouring disclosure was minimal given that there was only a "possible" breach of securities law. Accordingly, the final Wigmore factor favoured protecting the identity of the respondents' sources.

[42]   The application judge declined to grant a *Norwich* order.

[43]   As a final comment, at para. 74, the application judge added: "No one denies that great damage can be done to the integrity of capital markets and to shareholders and investors by secret and selective disclosure of confidential corporate information by deal-insiders in violation of provincial securities law." He observed that "[t]here may well be cases where the information provided by the confidential financial sources is in contravention of securities law and a claimed journalist-source privilege will be trumped by a greater public interest in the criminal investigation and prosecution of wrong-doers." This was not one of those cases because, in his view, the appellant's action lacked merit.

## D. ANALYSIS

[44]   I agree with much of the application judge's analsysis, but take a different view of some issues.

[45]   This case, as the application judge noted, requires the application of the *Norwich* test for determining when an applicant is entitled to learn the identity of a wrongdoer and the Wigmore test for determining whether a journalist can assert privilege to protect the identity of a confidential source. Only if the applicant is otherwise entitled to a *Norwich* order, is it necessary to consider the journalist's claim of privilege.

[46]   I proceed to first consider whether the appellant is able to satisfy the *Norwich* test.

### (1) The *Norwich* test

### (a) The first *Norwich* factor

[47]   The application judge did not consider whether the appellant satisfied the first step of the Norwich test. He simply assumed it had and proceeded on with the analysis. Although he assumed it was satisfied, his statement of the standard to be met is not correct. He said that at the first step the appellant was required to show a stronger case than an applicant in an ordinary *Norwich* application because freedom of expression was involved. In imposing an elevated standard he followed *Warman v. Fournier*, 2010 ONSC 2126 (CanLII), 100 O.R. (3d) 648, a decision of the Divisional Court, and *Morris v. Johnson*, 2011 ONSC 3996 (CanLII), 107 O.R. (3d) 311, a decision of the Superior Court that followed *Warman*. In my view, these cases do not state the law correctly. I review the relevant jurisprudence to indicate the proper standard.

[48]    In *Warman*, the applicant sought disclosure of the identities and email addresses of persons who, using pseudonyms, posted allegedly defamatory material on an Internet message board. At para. 42 the Divisional Court reasoned that since the case "engage[d] a freedom of expression interest, as well as a privacy interest, a more robust standard is required to address the chilling effect on freedom of expression that will result from disclosure." The court went on to explain that "[t]he requirement to demonstrate a *prima facie* case of defamation furthers the objective of establishing an appropriate balance between the public interest in favour of disclosure and legitimate interests of privacy and freedom of expression."

[49]   In my view this approach is inconsistent with the proper application of both the *Norwich* and Wigmore tests. Generally, values like freedom of expression are to be considered at step five of the *Norwich* test. In this case the Wigmore test is the proper framework for considering the "chilling effect on freedom of expression" and attempting to strike the "appropriate balance" of the competing interests involved. Adopting a "more robust standard" at step one of the *Norwich* test overlooks the function of step five, which is to consider whether the interests of justice favour disclosure. At step five of the *Norwich* analysis the Wigmore test can be applied to determine whether the interests of justice favour disclosure.  Automatically applying a more robust standard at step one of all *Norwich* applications involving freedom of expression loses sight of the case-by-case approach required by *National Post* and *Groupe Polygone*, and of the fact that the onus is on the media to satisfy the Wigmore test.

[50]   The most recent Court of Appeal decision on *Norwich* orders, *GEA*, adopted the factors set out in *Glaxo Wellcome PLC v. M.N.R.*, 1998 CanLII 9071 (FCA), [1998] 4 F.C. 439 (C.A.) and *Alberta (Treasury Branches) v. Leahy*, 2000 ABQB 575 (CanLII), 270 A.R. 1. In *Glaxo*, Stone J.A., writing for the Federal Court of Appeal said that the applicants must have a *bona fide* claim against the alleged wrongdoers. In *Leahy*, Mason J. of the Alberta Court of Queen's Bench stated the first requirement is that the applicant provide "evidence sufficient to raise a valid, *bona fide* or reasonable claim" at para. 106. Cronk J.A. in *GEA* did not discuss these cases' different articulations of the test, as the strength of the claim required by the first *Norwich* factor was not an issue in *GEA*.

[51]  In *Glaxo*, Stone J.A. said at para. 24:

> It seems to me that the requirement that the appellant have a *bona fide* claim against the alleged wrongdoers is intended to ensure that actions for a bill of discovery are not brought frivolously or without any justification.

He noted, at para. 30, that some Canadian courts require that the applicant show that he or she is likely to succeed at trial. Observing that the defendants might raise a number of defenses to the action, Stone J.A. said that seemed to him to go too far.

[52]   Mason J. in *Leahy* stated that the purpose of requiring a "valid, *bona fide* or reasonable claim" was to exclude frivolous claims. At para. 122 he agreed with Stone J.A.'s comments at para. 24 of *Glaxo* "that consideration of the evidence presented by the applicant will assist in ensuring that these applications are not brought frivolously and without justification". He went on to find that the applications before him "were neither frivolous nor unjustified" at para. 123.

[53]   In an earlier decision of this court, *Straka v. Humber River Regional Hospital* (2000), 2000 CanLII 16979 (ON CA), 51 O.R. (3d) 1, Morden J.A. accepted Stone J.A.'s explanation of the first *Norwich* factor in *Glaxo*. Interestingly, *Straka* was a *Norwich* case that involved the application of the Wigmore test, much like this case does.

[54]   The applicant in *Straka*, a doctor, sought the identities of persons who had written reference letters that led to the hospital refusing him staff privileges. After the hospital denied his request to see the letters, the doctor commenced an application for an order for production of the letters so he could pursue a possible action in defamation or for interference with economic relations, pursue staff privileges at the respondent hospital, *and evaluate whether or not to commence litigation to protect his reputation*. The hospital respondent claimed privilege as the references had been obtained on promises of confidentiality. The production order was refused and the doctor appealed.

[55]   In his analysis, Morden J.A. considered whether the applicant's potential claim against the persons who had given references was "*bona fide*". Ultimately the doctor's appeal was dismissed. However, what is important for our purposes is that it was not dismissed because he had failed to establish his proposed action had sufficient merit. Quite the contrary. The respondent hospital argued that a *Norwich* order was only available if the applicant has evidence of a legal wrong done to him or her and lacks only the name of the wrongdoer. In rejecting that argument, Morden J.A. referred to *P. v. T.*, [1997] 4 All E.R. 200, [1997] I.C.R. 887 (Ch. D.), in which *Norwich* relief was granted to permit an applicant to determine if, in fact, he had a cause of action against a suspected wrongdoer. Morden J.A. observed, at para. 52, that "If a narrow approach to determining the elements of an action for discovery were to govern this case, it would be difficult to say that a *bona fide* claim is asserted in this proceeding." The applicant was "unaware of what facts could have given rise to these letters" and "[h]e would like to find out so that he may take steps to clear his name through legal proceedings if this should prove necessary." At para. 53, Morden J.A. concluded in regard to the first *Norwich* factor:

> On these facts, I do not think that the appellant should be "non-suited" because his claim is not a *bona fide* one, i.e. that his claim should fail because the threshold requirement of a *bona fide* claim has not been shown. As I have said, we are concerned with an equitable remedy the granting of which involves the exercise of a discretion. The general object is to do

> justice. Accordingly, I do not think that a rigid view should be taken of the elements of the claim. With this approach in mind, I think that it is reasonable to accept that sufficient *bona fides* has been shown to justify consideration of the case as a whole. The nature and apparent strength of the appellant's case is a factor to be weighed together with the other relevant factors in arriving at the final determination of the claim.

[56]    Morden J.A. concluded the applicant's claim was sufficiently *bona fide* to escape being dismissed at the threshold level. In reaching that conclusion he did not scrutinize the ultimate merits of the claim too closely. He observed at para. 78, that even assuming the letters of reference were defamatory, there would still likely be defenses of justification and qualified privilege to be met and overcome before the applicant could succeed.

[57]    Cronk J.A. in *GEA* also referred to *P. v. T*. She explained, at para. 88, that the applicant in *P. v. T*. "obtained an order for pre-action discovery in circumstances where he was uncertain whether a tort had been committed so as to give rise to a cause of action." Cronk J.A. also noted with approval another case where pre-action discovery was ordered where its purpose was to obtain information required to determine whether a legal proceeding was appropriate. In *Isofoton S.A. v. Toronto Dominion Bank*, 2007 CanLII 14626 (ON SC), 85 O.R. (3d) 780, Spence J. of the Superior Court of Justice said at paras. 46-47:

> [T]he standard is that the claim must not be frivolous or vexatious, as opposed to higher standards imposed for other types of interlocutory relief such as the "strong *prima facie*" case required to obtain various types of injunction" … [T]he applicant merely seeks an opportunity to discover information that may or may not lead to a claim.

[58]    What I draw from these authorities is that the threshold for granting disclosure is designed to facilitate access to justice by victims of wrongdoers whose identity is not known. Judicial treatment of the *Norwich* application procedure should reflect its nature as an equitable remedy.

[59]    There is no requirement that the applicant show a *prima facie* case. The nature and apparent strength of the applicant's potential action should be weighed together with the other relevant factors.

[60]    The lower threshold at step one does not make *Norwich* relief widely available. *Norwich* relief is not available against a mere witness. *Norwich* relief is only available, as Lord Reid explained in *Norwich* at p. 175, against a person who is "mixed up in the tortious acts of others so as to facilitate their wrongdoing" even though this is "through no fault of his own". Most significantly the apparent strength of the applicant's case may be considered in applying the other factors.

[61]   Turning to this case, I would not subject the appellant's statement of claim to an exacting analysis. The statement of claim was available only because the application was not heard until a year after it was filed. In the typical *Norwich* application there is no statement of claim to scrutinize and the court is only able to consider the general parameters of a potential action the applicant may have.

[62]   The appellant claims to have a potential action under s. 138.3 of the *Securities Act,* which creates statutory causes of action for misrepresentation in relation to the secondary market. Subsection 138.3(2) creates a cause of action against "a person with actual, implied or apparent authority to speak on behalf of a responsible issuer" who makes a public oral statement that contains a "misrepresentation" that relates to the affairs of the "responsible issuer". The responsible issuer in this case is BCE. Subsection 138.3(3) creates a similar cause of action for a misrepresentation by an "influential person".

[63]   The appellant has difficulty establishing the elements of these causes of action. Without knowing who the sources are and what positions they occupied it cannot show that they had "actual, implied or apparent authority" to speak on behalf of BCE or were "influential" persons as defined in the *Securities Act*. Under the definition, an "influential person" might be an officer or an individual who performs functions similar to an officer. Disclosure would enable the appellant to ascertain this if an action under these sections is warranted.

[64]   Another question under both ss. 138.3(2) and s. 138.3(3) is whether the sources' statements made to Stewart for publication contain a "misrepresentation". "Misrepresentation" is defined in s. 1(1) of the *Securities Act* to mean an untrue statement of "material fact" or "an omission to state a material fact". At trial, the appellant will have to prove a statement was both "untrue" and was one of "material fact". A fact is "material" if it "would reasonably be expected to have a significant effect on the market price or value of the securities".

[65]   A rigorous approach to these issues would lead one to the conclusion the application judge reached: the sources might have breached the *Securities Act*, but they "probably" did not.

[66]   For example, as the application judge noted, the appellant is not in a position to prove the statements were not true. The essence of the quotation of the source who was "a high-level source at BCE" is that BCE board would not agree to lower the price. That source insisted "…the company's embattled board had little appetite for lowering the price of the offer" and stated "They're at $42.75 and damn the torpedoes". The unfolding of events would seem to indicate these statements were true. The BCE board did not agree to lower the price and a few days later agreement was reached to close the deal at $42.75.

[67]   Another difficulty the appellant faces is that other published stories had also expressed doubt that the deal would close soon if at all. This was the basis of the application judge's finding that the statements were not "material" and therefore

"would not reasonably be expected to have a significant effect" on the market price or value of BCE securities.

[68]   I would not take a definitive view of such issues at this stage of the analysis. Later I explain that the goal of the amendments to the *Securities Act* that created statutory civil actions for secondary market misrepresentation was primarily to promote compliance with the regulated disclosure regime rather than to compensate investors. The ambit of these statutory rights of action is best determined on a full record. For example, the meaning of the phrase "person with actual, implied or apparent authority to speak on behalf of a responsible issuer" in s. 138.3(2) should not be judicially interpreted in a factual vacuum.

[69]   As well, the appellant's litigation is still at its earliest stage. Broadly viewed, the general state of the negotiations, whatever the positions of the various parties, was related to the affairs of BCE. The confidential sources stated that the negotiations were almost collapsing and specifically attributed a timeline to a potential deal, saying that it was unlikely to proceed until the end of 2008. One source said, as a result, there was almost no chance BCE would pay out its quarterly dividend.

[70]   None of the other stories in the record attributed their information to a "high-level source…at BCE" who was "participating in the negotiations" or to an "executive at the bargaining table". Materiality is a complex, nuanced, fact-based question that is best decided on a more complete record. Moreover, it may be that a public oral statement by a person with actual, implied or apparent authority to speak or by an influential person can satisfy the requirements of s. 138.3(2) or (3) of the *Securities Act* even though the public oral statement made corresponds with general rumours that may have been published. I would leave for later the determination of whether the information disclosed was "material".

[71]   The appellant has pleaded that the statements in the story were not true but concedes it cannot now prove that claim. It submits that if the confidential sources were telling the truth, they breached the anti-tipping provision of s. 76(2) of the *Securities Act*. It submits that the breach of the anti-tipping provision informs a common law duty of care owed to shareholders and that but for the unlawful tipping it would not have sustained the losses that it did.[3]

[72]   Whether the statements were true, whether, if true, they constituted "tipping", and the merits of the appellant's common law claims are best left for trial or a later stage of the litigation. I note in passing that s. 138.13 of the *Securities Act* expressly preserves any common law rights of action otherwise available.

[73]   I would also leave for later the respondents' argument that the appellant's statutory-based claims were barred by the operation of ss. 138.8 and 138.14 of the *Securities Act*. It is not necessary to delve into the technical aspects of this argument. I simply note that the Chief Justice has appointed a five judge panel to reconsider the court's interpretation of these sections in *Sharma v. Timminco Ltd.*, 2012 ONCA 107 (CanLII), 109 O.R. (3d) 569.

[74]     Issues such as causation and damages are also best left for later in the litigation process.

[75]   In short, like Morden J.A. in *Straka*, I would not apply a narrow approach at this stage of the analysis. The appellant is not engaged in "mere fishing". It is not seeking evidence but only the names of the alleged wrongdoers. Its proposed action is not frivolous. I would conclude that sufficient *bona fides* has been shown to justify consideration of the case as a whole. The apparent strength of the appellant's case can be revisited in the final weighing of all the relevant factors together.

### (b) The second, third and fourth *Norwich* factors

[76]   Little discussion is required of the second, third and fourth *Norwich* factors. As noted above, Stewart and the Globe and Mail are "somehow involved in the acts complained of", they are the only practical sources of the information, and they can be indemnified for any costs of making disclosure.

### (c) The fifth *Norwich* factor

[77]    The fifth *Norwich* factor is whether the interests of justice favour the obtaining of disclosure. This factor is broad and encompasses the interests of the applicant, the respondents, the alleged wrongdoers and the administration of justice. The interests of the respondents and the greater public interest sweep in their claim of journalist-source privilege. The privilege claim must be determined by application of the Wigmore test. In this way the *Norwich* and Wigmore tests intersect, as the application judge noted.

[78]    I also agree with the application judge that if the Wigmore test is satisfied by the media respondents, it probably will not be in the interests of justice to order disclosure, and on the other hand if the Wigmore test is not satisfied, it probably will be in the interests of justice to order disclosure.

[79]    Applying the Wigmore test within the *Norwich* test requires close attention to the placement of the onus. The onus is on the appellant to establish the fifth *Norwich* factor, but the onus is on the respondents to satisfy the Wigmore test. The placement of the onus was a major issue in *National Post*. In that case, the newspaper argued that once the first three Wigmore criteria were established, the onus should switch to the party seeking disclosure to show why, on a balance of probabilities, disclosure should be ordered. However, Binnie J., writing for the majority, said at para. 60, "It is the media that advances the proposition that the public interest in protecting its secret source outweighs the public interest in the criminal investigation. The burden of persuasion therefore lies on the media."

[80]   As Binnie J. noted, "the evidence is presumptively compellable and admissible" until the journalist has satisfied the Wigmore test.

[81]   In my view the onus is on the appellant to establish all aspects of the interests of justice other than the respondents' claim of privilege. The respondents have the onus of establishing their claim of privilege.

## (2) The Wigmore test

[82]   I set the Wigmore test out again for the sake of convenience:

> (i) the communication originated in a confidence that the source's identity will not be disclosed;
>
> (ii) anonymity is essential to the relationship in which the communication arises;
>
> (iii) the relationship is one which should be sedulously fostered in the public interest; and
>
> (iv) the public interest served by protecting the identity of the informant outweighs the public interest in getting at the truth.

### (a) Wigmore factors one and two

[83]   The first and second factors are easily satisfied in this case. The appellant does not contest that the communications originated in a confidence that the identities of the sources would not be disclosed and that confidence is essential to the relationship between Stewart and his sources.

### (b) Wigmore factor three

[84]   As summarized above, the application judge reasoned that as long as the journalist was an accredited professional with a legitimate news organization, the third step was readily satisfied. He rejected the appellant's argument that the relationship should be characterized more particularly as that between corporate insiders who breached the securities law disclosure regime and a business reporter who did not comply with his own newspaper's stated policy regarding the granting of confidentiality to sources. In rejecting this argument the application judge reasoned that the third and fourth steps of the Wigmore test must be kept analytically distinct. I share his concern.

[85]   Characterizing the relationship with the narrow focus the appellant advocates, would lead to the two factors overlapping. Such overlapping would be unavoidable if the content of the impugned communication were taken into account at step three. It is the content of the communication that differentiates corporate sources such as those in this case from corporate sources who blow the whistle on companies defrauding the public. The content of the communication, as the application judge pointed out, is best analyzed at step four of the Wigmore test.

[86]   Second, to avoid redundancy, the "public interest" that is considered at step three must be different in nature from the "public interest" considered at step four. The redundancy can be avoided by considering, at step three, only the "public

interest" in fostering the general relationship involved. A too fine consideration of the relationship at step three would involve public interest considerations that would duplicate some of the analysis at step four.

[87]   I find the question a difficult one, though, because the appellant is able to point to much language in *National Post* that might seem to support its position. To begin with, the appellant points to the same paragraph that the application judge cited. The application judge relied on Binnie J.'s remark at para. 57 of *National Post* that "the relationship between the source and a blogger might be weighed differently than in the case of a professional journalist…" to support the conclusion that the relationship in this case should be viewed generally as one between "a source and a professional journalist". I set out the entire paragraph in which the remark appears:

> The third criterion (that the source-journalist relationship is one that should be "sedulously fostered" in the public good) introduces some flexibility in the court's evaluation of different sources and different types of "journalists". The relationship between the source and a blogger might be weighed differently than in the case of a professional journalist like Mr. McIntosh, who is subject to much greater institutional accountability within his or her own news organization. These distinctions need not be canvassed in detail here since the appellants have made out on their evidence, in my opinion, that in general the relationship between professional journalists and their secret sources is a relationship that ought to be "sedulously" fostered and no persuasive reason has been offered to discount the value to the public of the relationship between Mr. McIntosh and his source(s) in this particular case.

[88]   The appellant submits that while Binnie J. accepted that the relationship between journalists and sources should be fostered "in general", he left open the possibility that "persuasive reason" could be offered "to discount the value to the public of the relationship…" in a particular case.

[89]   Viewing the relationship generally as one between "a source and a professional journalist" does not allow for any differentiation among "sources". Earlier, at para. 40, Binnie J. said that it was not wise to grant immunity to whichever "sources" "journalists" deem worthy of a promise of confidentiality. The general approach does not allow "flexibility in the court's evaluation of different sources", which Binnie J. specifically states this factor introduces.

[90]   The appellant points out that the confidential sources in this case were not whistleblowers shedding light "on the dark corners of some private institutions". They breached a law that, rather than prohibiting public disclosure, is designed to ensure the public receives full, true, plain and timely disclosure of all material facts.

[91]   Characterizing the relationship generally also detracts from the "case-by-case" analysis that Binnie J. took great pains to emphasize must be used. As Binnie J. observed at para. 45 of *National Post,* there is a wide divergence even among legitimate news organizations. He observed that,

> The evidence shows that journalistic practice varies considerably as to when promises of confidentiality are properly made. Many news organizations require the journalist to consult with an editor before making such a promise. Others, including the *National Post*, do not. What would be the criteria for such a class privilege to apply? The various media codes of ethics are themselves in disagreement.

[92]   The appellant says that the analysis of this factor should take this variety into account. It submits that in this case the court should take into account that Stewart is a business reporter, in fact the editor of the business section of the Globe, that he promised absolute confidentiality to the sources without considering whether their misconduct might contravene Ontario securities laws, that he was unfamiliar with those laws, that he never turned his mind to whether the sources might have been attempting to use him to manipulate the capital markets, and that the Globe and Mail's *Editorial Code of Conduct* provides that journalists first ascertain why the sources are willing to provide the information before promising confidentiality.

[93]   Viewing the relationship generally at step three of the Wigmore test has the consequence that almost all journalist-source cases will be determined by the fourth Wigmore factor. The fourth Wigmore factor is arguably the most subjective factor. Subjectivity reduces the capacity of structured analysis to guide decisions.

[94]   While I recognize the force of the appellant's argument, I am unable to accept it. In *National Post* the relationship between the professional journalist and the confidential source was accepted as one that ought to be sedulously fostered despite the fact the source appeared to be a fraudster rather than a true whistleblower. As noted above, focusing on the specific relationship in this case would result in blurring the analysis at steps three and four of the Wigmore test. In *National Post* Binnie J. observed that there was room for the law to grow and this may be an area in which it evolves further.

[95]   In this case I would characterize the relationship generally and conclude that the relationship between a journalist and a source is one that should be sedulously fostered in the public interest.

[96]   I proceed to consider the fourth Wigmore factor.

### (c) The fourth Wigmore Factor

[97]   The application judge set out the approach to the fourth Wigmore factor as summarized by Binnie J. in para. 64 of *National Post*. The court must weigh up the evidence on both sides, supplementing it with judicial notice, common sense, good

judgment and appropriate regard for the "special position of the media". The question, as the application judge put it at para. 69, is "whether the public interest in protecting the identity of the informant outweighs the public interest in getting at the truth."

[98]　　I begin by discussing the competing general public interests, then turn to matters particular to this case, and finally compare the harm that would flow from recognizing the privilege in this particular case with the harm that would flow from rejecting it.

### (i) The public interest in the media's use of confidential sources

[99]　　The public interest in a free press is clear. Confidential sources are closely aligned with a free press. As Binnie J. observed at para. 28 of *National Post,* the public has an interest in being informed about matters of importance "that may only see the light of day through the cooperation of sources who will not speak except on condition of confidentiality". He added that many important controversies have been unearthed only because of secret sources.

[100] At para. 33, Binnie J. directed courts to recognize that an important element in the newsgathering function is the ability of the media to make use of confidential sources. Unless the media can offer anonymity in situations where sources would otherwise dry up, freedom of expression in debate on matters of public interest would be badly compromised and important stories would be left untold.

[101] Anxiety among potential sources that journalists could be compelled to reveal their identity later would make it less likely these sources will provide information to journalists. If potential sources have to worry that a judge, after the fact, will override the journalist's promise of confidentiality, they will not confide information that the public has an interest in learning through the media.

[102] Professor Melanie Leslie of Yeshiva University's Cardovo School of Law put it well: "Privilege generates the communication that the privilege protects. Eliminate the privilege, and the communication disappears".[4]

### (ii) The public interest in compliance with the *Securities Act* is served by the appellant's private cause of action

[103] In this section I explain that the appellant's proposed claim serves the public interest by promoting compliance with the *Securities Act*.

[104]　The *Securities Act* is designed to further the public interest by protecting investors and ensuring that capital markets are fair, efficient and transparent. These goals were set out in the *Report of the Attorney General's Committee on Securities Legislation in Ontario* (Toronto: Queen's Printer, 1965), the "*Kimber Report*", which forms the basis for modern Canadian securities regulation.

[105] Consistent with the *Kimber Report*, s. 1.1 of the *Securities Act* states that the purposes of the Act are "to provide protection to investors from unfair, improper or fraudulent practices" and "to foster fair and efficient capital markets and confidence

in capital markets". Section 2.1 indicates that a fundamental principle of disclosure is that it be "timely, accurate and efficient".

[106] Section 76(2) of the *Securities Act* provides:

> No reporting issuer and no person or company in a special relationship with a reporting issuer shall inform, other than in the necessary course of business, another person or company of a material fact or material change with respect to the reporting issuer before the material fact or material change has been generally disclosed.

[107]  The *Securities Act* Part XVIII sets out a "Continuous Disclosure Regime" ("CDR") that regulates the flow of information to the public and prohibits deal insiders from communicating non-public, material information to anyone.

[108]  The Continuous Disclosure Regime is in place to fulfill the objectives of the *Securities Act*. Mark R. Gillen, in *Securities Regulation in Canada,* 3rd ed. (Toronto: Carswell, 2007) at p.181*,* notes that the CDR "implements the broad objective of creating and maintaining confidence in Canadian capital markets by providing an information base from which investment decisions can be made". The CDR aims to protect the public from receiving information that is incomplete, inaccurate or misleading. This is a broad public interest function.

[109]  Adequate disclosure of information about companies that issue securities to the public has repeatedly been recognized by securities regulators as an important part of protecting investors and promoting efficient capital markets. *The Toronto Stock Exchange Committee on Corporate Disclosure, Final Report, Responsible Corporate Disclosure - A Search for Balance* (March 1997), the "*Allen Committee Report*", which is the foundation for Part XXIII.1 of the *Securities Act* (entitled "Civil Liability For Secondary Market Disclosure"), highlighted the importance of full and accurate disclosure at p. vi as follows:

> The capital market system in Canada is built on a foundation of information – full, true and plain disclosure of all material facts in a prospectus and continuous disclosure of material changes and information. Companies are obliged to provide this information to their shareholders and the investing public. *Information is really the lifeblood of trading on securities markets.* [Emphasis added].

[110] The Allen Committee concluded in its report at p. vii that there was "a sufficient degree of non-compliance with the current continuous disclosure rules to cause concern." In order to promote more effective compliance with the CDR, the Committee recommended "a limited statutory regime whereby issuers and others who are responsible for continuous disclosure violations may be liable in civil actions brought by injured investors to recover their damages." The Committee's

concern was that the sanctions available to securities regulators provide an "inadequate deterrent".

[111]  The Committee also stated at p. 40 that the introduction of civil liability should complement existing public law enforcement mechanisms, which do not provide a sufficient level of enforcement on their own:

> After extensive deliberations, the Committee has concluded that, while adequate funding for [securities regulators] is essential for regulation of capital markets, it will not, on its own, provide sufficient deterrent to continuous disclosure violations. The Committee believes that the additional deterrence represented by private plaintiffs armed with a realistic remedy will be important in ensuring compliance with continuous disclosure rules in Canada. *All regulators to whom the Committee has spoken, including representatives of the SEC, believe strongly that compliance is best accomplished through a combination of regulatory enforcement and private enforcement.* These views, in part, prompted the recommendations for a regime of statutory civil liability. [Emphasis added].

[112]  In 2000, the Canadian Securities Administrators, the umbrella organization of provincial securities regulators, proposed amendments to securities legislation that would implement the recommendations of the Allen Committee in *CSA Notice 53-302 - Proposal for a Statutory Civil Remedy for Investors in the Secondary Market and Response to the Proposed Change to the Definitions of "Material Fact" and "Material Change", (2000) 23 O.S.C.B. 7383.* These draft amendments were then recommended by the CSA to their respective member governments.

[113]  The *CSA Notice 53-302* stated that the CSA was committed to advocating for the implementation of the amendments, "so investors are empowered with the tools to seek redress when they suffer damages as a result of misrepresentative disclosure, *resulting in improved continuous disclosure in Canada"* (emphasis added) at p. 7388. The CSA also noted how public and private regulation are both critical to the success of the regime: "[P]rivate rights of action and public regulation together provide important, effective and complementary incentives to issuers and others involved in the prospectus process to ensure sound disclosure."

[114]  Bill 198, *Keeping the Promise For a Strong Economy Act (Budget Measures),* 3rd Sess., 37th Leg., Ontario, 2002, which amended the *Securities Act* to include private civil liability in what is now Part XXIII.1, incorporated the recommendations of the Allen Committee, and generally mirrored the amendments put forward by the CSA. Several cases have held that the Allen Committee's report may be used as evidence of legislative intent regarding Part XXIII.1[5]. The legislative history

outlined above makes clear that the private causes of action created by Part XXIII.1 were designed to promote compliance with the CDR.

[115] The Five Year Review Committee, struck to review the Ontario *Securities Act*, also supported the civil liability recommendations of the CSA in its *Five Year Review Committee Final Report – Reviewing the Securities Act (Ontario)*, (Toronto: Queen's Printer, 2003). This report encouraged the coming into force of the Bill 198 amendments, which finally occurred in 2005. The Five Year Committee noted, at p. 131, one commentator's letter that supported the civil liability amendments because, "the competitiveness of the Canadian capital markets depends, in part, on the ability to demonstrate that Canadian securities laws are as protective of investors' rights as those in other major markets".

[116] The purpose of the private civil liability provisions under Part XXIII.1 is to supplement public enforcement in order to bolster compliance with the overall regulatory scheme. Part XXIII.1 shows that the appellant's proposed claim should not be viewed as serving solely the private interests of an aggrieved investor. Rather, the appellant's action, based on the defendants' noncompliance with the regulatory disclosure regime, serves the public interest by promoting compliance with that regime.

#### (iii)  The Securities Commission's decision not to investigate

[117]  The Securities Commission's decision not to investigate the confidential sources was important to the application judge's final weighing up. He said at para. 72: "The OSC's decision not to investigate was a public interest decision. Any further public interest in "getting at the truth" is minimal to non-existent." It is clear he regarded the appellant's proposed action as serving purely private interests.

[118]  I have noted above that the Allen Committee considered that public law enforcement by securities regulators was not sufficient protection and "that the additional deterrence represented by private plaintiffs armed with a realistic remedy [would] be important in ensuring compliance with continuous disclosure rules in Canada." Part XXIII.1 was added to the *Securities Act* as a result.

[119]  In this case the public interest in a free press is not pitted against the mere pursuit of a private cause of action. The appellant's proposed action would serve the important public interest of fostering compliance with the *Securities Act*'s Continuous Disclosure Regime.

#### (iv)  The public interest in knowing the status of the transaction

[120]  The application judge found that news reports about when or whether the transaction would close were clearly in the public interest because the BCE leveraged buyout was a matter of national, even international, interest and importance.

[121] As I see it, the public's interest in information about the transaction supports the appellant as much as it does the respondents. The interest and entitlement of

the public to reliable information about the transaction is served by promoting compliance with the *Securities Act*'s Continuous Disclosure Regime. The CDR regulates the source, manner, timing and content of any public disclosure about the transaction in order to protect the public interest.

[122]  This is not a case in which the sources used the media to provide the public with important information about corporate malfeasance that the public would not otherwise receive.  Both freedom of the press and compliance with the Continuous Disclosure Regime satisfy the public's interest in meaningful, timely, complete and accurate information about the status of the transaction.

### (v) The National Newspaper Award

[123]  The application judge weighed on the side of upholding the privilege the fact that the respondents' coverage of the BCE deal was nominated for a National Newspaper Award. I do not understand how the Award has any relevance to the legal issues that must be determined.

### (vi)   Stewart's promise of confidentiality

[124]  The fact that Stewart gave the sources an absolute promise of confidentiality is not sufficient to make out the claim of privilege. At para. 69 of *National Post* Binnie J. noted that, "The bottom line is that no journalist can give a source a total assurance of confidentiality."  He added that "[a]ll such arrangements necessarily carry an element of risk that the source's identity will eventually be revealed." The risk is that the courts will determine after the fact whether a promise of confidentiality will be respected. He said "the extent of the risk will only become apparent when all the circumstances in existence at the time the claim for privilege is asserted are known and can be weighed up in the balance." He noted at para. 30 that "most journalistic codes of ethics recognize that the promise of confidentiality cannot be absolute" and cited as an example, the Canadian Association of Journalists' *Guidelines for Investigative Journalism*.

[125]  Binnie J. explained at para. 69 that "[w]hat this means, amongst other things, is that a source who uses anonymity to put information into the public domain maliciously may not in the end avoid a measure of accountability." It could not be plainer that in the legal regime after *National Post*, journalists and sources must understand that the courts may refuse to uphold the type of absolute promise of confidentiality that Stewart made in this case.

[126]  The respondent's main argument in this case is that Stewart's promise of confidentiality to the sources should be upheld because of the importance of such promises to business journalism. The argument is akin to that advanced by the CCLA, and rejected, in *National Post*. Binnie J. summarized the CCLA's argument at para. 37. The CCLA argued that upon a journalist showing that he or she is a journalist, was engaged in newsgathering activity, and acquired information under a promise of confidentiality, the journalist's right to keep the source confidential would be constitutionally guaranteed by s. 2(b), subject to s. 1.

[127]  The respondents' argument here does not claim constitutional protection but does claim the same three elements should dictate the result of the Wigmore test. This argument, it seems to me, risks becoming circular – the fact the promise was made is justification for upholding it.

[128]  In this case Stewart, in giving an absolute promise of confidentiality, does not appear to have turned his mind to the requirements of the *Securities Act,* the possible motivations of the sources in disclosing information to him, or why they consented to some identifying information being included in the story.

[129]  Nevertheless, in this case I would attach limited weight to the fact that absolute guarantees of confidentiality are not justified in law. Stewart gave his guarantees to the sources before the Supreme Court's decision in *National Post*. And as Binnie J. explained at para. 30 of that decision, "The courts have long accepted the desirability of avoiding where possible putting a journalist in the position of breaking a promise of confidentiality or being held in contempt of court."

### (vii)  The strength of the appellant's proposed action

[130]  The strength of the appellant's proposed action was the determining factor in the application judge's final balancing. As noted, after conducting a searching examination of the merits of the appellant's proposed action, he concluded it had little merit and would likely fail.

[131]  Subjecting the merits of the action to a searching examination is the approach taken by the dissenting judge in *National Post*. An important part of the dissent's analysis was that there was very little prospect that the investigation would prove fruitful if the envelope, which was sought in that case, were ordered produced.

[132]  By contrast, Binnie J., writing for the majority, said that the "the reviewing judge ought not to have pre-empted the forensic investigation by seemingly prejudging the outcome… without first considering all the relevant factors in her assessment" at para. 72. He went on to say that even if production of the envelope would be "extremely unlikely" to aid the investigation, the envelope should still be produced. The balancing of all the factors would still lead him to conclude that "the injury that is likely to result from disclosure does not outweigh the public interest in correctly disposing of the criminal investigation."

[133]  I draw from this that whether the investigation was ultimately successful or not, its correct disposal was an important public interest.

[134]  *National Post* involved a criminal investigation. Our system also places value upon the correct disposal of civil litigation. *Groupe Polygone* was a civil case. Lebel J. repeatedly made the point that the public interest in maintaining journalist-source confidentiality should be weighed against the importance of disclosure to the administration of justice: see paras. 17, 68, 69.

[135]  An apt illustration of the importance of the correct disposal of civil litigation is the case *M. (A.) v. Ryan*, 1997 CanLII 403 (SCC), [1997] 1 S.C.R. 157, which

involved a claim for damages for sexual assault. The plaintiff claimed privilege in a psychiatrist's notes of communications with her. McLachlin J. (as she then was) writing for the majority, remarked that there was a compelling interest in protecting the communications from disclosure. However, she upheld the decision below that the notes should be produced saying at para. 31:

> More, however, is required to establish privilege. For privilege to exist, it must be shown that the benefit that inures from privilege, however great it may seem, in fact outweighs the interest in the correct disposal of the litigation.

[136]  The correct disposal of litigation is deserving of weight under the Wigmore test.

[137] That said, the Wigmore test is being applied as part of the fifth *Norwich* factor. Following the guidance provided by Morden J.A. in *Straka*, the nature and apparent strength of the appellant's case is to be weighed together with the other relevant factors. I refer to my earlier discussion of the difficult hurdles the appellant's action faces. The appellant has not put forward any evidence that the statements were false or materially misleading. I agree with the application judge that the fact there was a breakthrough just four days later does not support the inference the statements were untrue at the time they were made. The appellant's claim that the sources had ulterior motives to make the statements is speculative.

[138] On the evidence the appellant has put forward at this stage, I would agree with the application judge that the appellant's action is not likely to be successful.

### (viii) The harm that would flow if the claim of privilege is rejected

[139]    The respondents' position is that Stewart's absolute assurance of confidentiality to the sources should be upheld because of the importance of such promises to business journalism. It is worth highlighting that the argument is general and not specific to this case. The respondents do not argue that in this particular case the promise of confidentiality should be upheld because otherwise important undisclosed information would never have come to the attention of the public on this occasion. The respondents have not attempted to characterize the sources as whistleblowers. Rather, the respondents argue that if Stewart's absolute assurance of confidentiality given in this case is overridden by the courts, in the future all business sources, indeed all sources, will become more reluctant to share information with the media and the public's right to know will suffer generally.

[140]    This is a forceful argument. It loses much of its force, however, when considered in light of the Supreme Court's decision in *National Post*.  As noted, the legal regime following *National Post* is that a court may override a journalist's absolute assurance of confidentiality. Overriding the absolute promise Stewart made to the sources would simply apply the legal framework of *National Post* and would not usher in a new state of affairs.

[141]  Given the law pronounced in *National Post*, a rejection of the privilege in this case would not result in any significant change in the confidence sources can repose in journalists' assurances in the future. Both before and after the decision in this case the situation remains the same. Journalists can seek and obtain information from business sources. Business sources have to keep in mind their obligations and liabilities under the law and that they may be called to account.

### (ix)   The harm that would flow from upholding the claim of privilege

[142]  Upholding the privilege would not deny the appellant a remedy. If as the appellant alleges the sources had actual, implied or apparent authority to speak on behalf of BCE or were influential persons, and if, as it alleges, the sources' statements were false it can proceed with its statutory causes of action against BCE and its common law claims against BCE and Canada Inc. This observation should not be taken to express any view on the merits of the appellant's application for leave under s. 138.8 of the *Securities Act* that would be necessary no matter who are the defendants to the action.

[143]  Upholding the privilege might be seen to result in the harm of providing deal insiders with comfort they are able to provide secret information to journalists in order to manipulate the markets and avoid accountability by sheltering behind impenetrable journalist-source protection. In my view, this potential harm would be greatly mitigated by the appellant's action against BCE. Actions against responsible issuers will provide them with reason to discourage their officers and employees from making improper disclosures.

[144]  As I see it, upholding the privilege would not neutralize the legislature's efforts to reduce the public harm of improper corporate disclosures by adding civil remedies to the *Securities Act* to complement regulatory enforcement mechanisms.

### (x)   The final weighing up

[145]  In the final weighing up I would conclude that the greater public interest is served by upholding the respondents' claim of privilege. The public interest in free expression must always be weighed heavily in the balance. The balance may well have been shifted, had the apparent strength of the appellant's case been compelling; however the appellant has not put forward such a case. Whatever the merits of its case, the appellant can seek a remedy from BCE and Canada Inc. The public interest in promoting compliance with the disclosure regime regulated by the *Securities Act* can be adequately served by the appellant proceeding with its action against BCE.

## E.   CONCLUSION

[146]  I would conclude that the respondents have satisfied the Wigmore test, and hence, the appellant has failed to satisfy the *Norwich* test. I would dismiss the appeal.

[147] This was a difficult case. Corporate executives who engage in the dangerous practice of providing journalists with information anonymously during the course of sensitive negotiations should understand the courts may not uphold a journalist's assurances of confidentiality.

[148] I would fix the successful respondents' costs of the appeal in the amount of $15,000.00 all inclusive.

"R.G. Juriansz J.A."
"I agree John Laskin J.A."
"I agree M.H. Tulloch J.A."

Released:

Page 1
00074

## APPENDIX

The Globe and Mail (Canada)

June 30, 2008 Monday
Correction Appended

**Haggling may stall BCE deal till year-end;**
**Lenders are balking at the purchase price as buyers dig in; 'they're at $42.75, and damn the torpedoes'**

**BYLINE:** SINCLAIR STEWART

**SECTION:** REPORT ON BUSINESS: CANADIAN; TELECOM: TAKEOVERS; Pg. B1

**LENGTH:** 781 words

**DATELINE:** NEW YORK

The problem-plagued $35-billion takeover of **BCE Inc.** will likely be delayed until the end of the year, owing to increasingly fractious negotiations between the company's private equity buyers and a syndicate of lenders who are pushing to lower the value of the buyout, according to people involved in the negotiations.

Sources close to the talks say the banks financing the deal are balking at the proposed purchase price of $42.75 a share, and are instead insisting that the company should be valued on the same basis as

rival Telus Corp., which would imply a steeply discounted price of between $35 and $38 a share.

The banks are also seeking stricter covenants, more favourable interest rates on their loans and a host of other concessions that the buyers, led by the Ontario Teachers' Pension Plan and New Jersey-based Providence Equity Partners, believe go well beyond the bounds of the commitment letters these lenders signed last June.

Although the two sides are still talking, several sources described the tenor of the discussions as grinding and suggested that the parties remain far apart on a number of key issues.

The plan was for BCE and its banks to begin marketing the deal to investors in mid-July, and then close it some time before the end of the third quarter. But participants now say that schedule is wildly optimistic, and have not ruled out the possibility that the private equity buyers will have to sue the banks to put the buyout back on track. Citigroup Inc., Deutsche Bank AG, Royal Bank of Scotland PLC and Toronto-Dominion Bank are helming the $32-billion debt package.


Page 2
00075

Haggling may stall BCE till year-end; Lenders are balking at the purchase price as buyers dig in; 'they're at $42.75, and damn the torpedoes' The Globe and Mail (Canada) June 30, 2008 Monday Correction Appended


"Everyone has underestimated when this deal gets done," said one executive at the bargaining table. "It's Christmas."

The source added he did not think the buyers and the banks would reach an agreement over the financing terms this summer, if at all.

BCE is expected to announce today whether it will pay out its $294-million quarterly dividend or retain the cash to improve its balance sheet and provide added comfort to nervous lenders. Sources say given the current uncertainty around the acquisition, there is almost no chance BCE will pay out the money.

If the deal doesn't close until year end, that could mean the company's cash position could be bolstered by an additional $900-million.

The company and its buyers have received all the regulatory approvals needed to move forward by today's deadline, though the bank financing remains tenuous.

Two high-level sources, one at BCE and another that is participating in negotiations, insisted that the company's embattled board has little appetite for lowering the price of the offer. That would necessitate another shareholder vote, another round of court and regulatory approvals, and perhaps another year's worth of delays. It would also be a black mark on the BCE directors, who were roundly criticized last year for running a clumsy auction.

"They're at $42.75, and damn the torpedoes," said one of the sources.

If the board holds fast, the buyers and banks will have to find compromises in other places, such as covenants and rates. It appeared they were close to such an agreement in late May, but talks fell apart after a surprise Court of Appeal decision froze the deal, ruling BCE failed to take into account the interests of its bondholders when it agreed to be taken over in the largest private equity transaction in history.

The Supreme Court overruled that decision this month, paving the way for talks to resume, but the banks have dug their heels in deeper since then, according to people familiar with the matter.

A spokeswoman for the bank syndicate said the banks stand by their earlier commitment to the deal.

The banks issued a statement after BCE won its Supreme Court ruling that said they "expect that the transaction will close in accordance with the … agreement."

Officials at BCE and the private equity buyers declined to comment.

The four banks pledged to supply what they called a "term loan A facility" worth $4.2-billion and a $16.5-billion "term loan B facility" when the deal was struck 12 months ago.

Page 3
00076

Haggling may stall BCE till year-end; Lenders are balking at the purchase price as buyers dig in; 'they're at $42.75, and damn the torpedoes' The Globe and Mail (Canada) June 30, 2008 Monday Correction Appended

Some of these banks, however, managed to wring price concessions from Clear Channel Communications Inc., after a similar fight with that company and its private equity buyers. The two sides compromised amid a legal battle in which Clear Channel alleged the lenders were not living up to their commitments.

Sources say that has emboldened the banks in the current negotiations.

Although Teachers and Providence have not ruled out suing their lenders if their stalemate continues, this is viewed as a last resort, sources said.

BCE INC. (BCE)

Friday's close: $36.76, down 25¢

**LOAD-DATE:** July 1, 2008

**LANGUAGE:** ENGLISH

**CORRECTION-DATE:** July 1, 2008

**CORRECTION:** Providence Equity Partners is based in Rhode Island. Incorrect information was published yesterday.

**PUBLICATION-TYPE:** Newspaper

Copyright 2008 The Globe and Mail, a division of CTVglobemedia Publishing Inc.
All Rights Reserved.

---

[1] The entire article is reproduced as an appendix to these reasons.

[2] Section 2(b) of the Charter guarantees the fundamental freedom of expression "including freedom of the press and other media of communication".

[3] If the statements were true, the appellant would not have a private right of action under the *Securities Act* for insider tipping. The private right of action for insider tipping, created by s. 134(2), only provides recourse to persons who sell securities to, or purchase securities from, the person who obtained the inside information from the insider.

[4] Melanie B. Leslie, *The Costs of Confidentiality and the Purpose of Privilege*, (2000) Wis. L. Rev 31 at 31.

[5] See e.g. *Ainslie v. CV Technologies Inc.* (2008), 2008 CanLII 63217 (ON SC), 93 O.R. (3d) 200 (S.C.) at paras. 7-13; *Silver v. Imax Corp.* (2009), 66 B.L.R. (4th) 222 (Ont. S.C.) at paras. 225-231; *Frank v. Farlie, Turner & Co.*, 2012 ONSC 5519 (CanLII) at paras. 71-77. *Abdula v. Canadian Solar Inc.*, 2012 ONCA 211 (CanLII), at paras. 50-66

By  for the law societies members of the  Federation of Law Societies of Canada   Scope of Databases
Tools
Terms of Use
Privacy
Help
Contact Us
About