# WESTLAW



**2014 QCCS 2281**
Cour supérieure du Québec

**Gagné c. McKay**

Cour supérieure du Québec | May 16, 2014 | 2014 QCCS 2281, 2014 CarswellQue 11135 | *(Approx. 20 pages)*

2014 CarswellQue 11135, 2014 CarswellQue 5015, 2014 QCCS 2281, 14 C.C.L.T. (4th) 10, 242 A.C.W.S. (3d) 495, J.E. 2014-1298, EYB 2014-237726

France Gagné, Demanderesse, c. Scott McKay et Permanence nationale du Parti québécois, Défendeurs

Moulin J.C.S.

Judgment: 16 mai **2014**
Docket: C.S. Qué. Québec 200-17-015297-112

Counsel: *Me Suzy Guylaine Gagnon*, pour le demandeur
*Me Benoît Mailloux*, pour Scott McKay
*Me Stéphane Galibois*, pour Permanence nationale du Parti québécois

Subject: Constitutional; Torts

> **Related Abridgment Classifications**
> For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

*Moulin, J.S.C.*:

[UNOFFICIAL ENGLISH TRANSLATION]

**JUDGMENT on claim of injury to reputation**

**Presentation**

1     France Gagné brings an action in defamation against Scott McKay, in which he claims a total of $250,000 ($50,000 for injury to reputation and $100,000 in punitive damages), with interest and the additional indemnity under article 1619 *C.C.Q.* He had also claimed the same amounts from the Permanence nationale du Parti Québécois but reached a settlement with that party during the trial. McKay recognizes that the settlement in question has no effect on the case he has to meet.

2     The action arises from comments posted on social media and repeated in newspaper articles, in which McKay described Gagné as a [TRANSLATION] « traitor », among other things. McKay says that he reacted unthinkingly to political comments from Gagné that had appeared in a newspaper, which he read on Gagné's social media account and found to be unacceptable given the context in which they were published.

3     Gagné was hurt and demanded an apology, which was slow to come. He seeks financial compensation. He is entitled to compensatory damages if he is able to establish on a balance of probabilities that McKay's comments constituted a fault in the context in which they were made and that he has suffered prejudice - namely, injury to his reputation - in connection with this fault. As for punitive damages, they will be awarded if he is able to prove, also on a balance of probabilities, not only wrongful interference but also that the result was intentional.

**Background**

4     France Gagné, who suffers from a serious visual handicap, has shown courage and determination since his childhood. After completing a college degree in business administration in 1990, he obtained a university certificate in the same subject in 1996.

He has worked in accounting and management since 1986, and has had the same employer since 2008.

5    He is also an experienced paralympian, having represented Canada in track and field internationally on numerous occasions since 1990. He has won some 200 medals, over 50 of them in international competitions and several of them gold. He has given a hundred or so talks on behalf of social welfare agencies and businesses and in schools. In 1992, 1996, 2000 and 2004, he received medals from the Quebec National Assembly.

6    He has also dabbled in politics. He was a losing candidate for the Parti Québécois in the December 2008 provincial election and for the Bloc Québécois in the October 2008 and May 2011 federal elections.

7    Following his electoral defeat in May of 2011, he gave a telephone interview to Luc Fournier, a journalist, during which they discussed his sports career, and the conversation also touched on politics.

8    The political news at the time was focused on the defeat of the Bloc Québécois on May 2, 2011, and the resignation of several MNAs from the Parti Québécois, the official opposition in the National Assembly, to sit as independents.

9    The atmosphere in these two political parties was quite gloomy. A new political movement known as the Coalition pour l'avenir du Québec was forming under the leadership of a former Parti Québécois MNA who had once held ministerial positions in the Quebec government.

10    On the morning of July 11, 2011, the newspaper Le Soleil published an article by the journalist Luc Fournier entitled [TRANSLATION] « Bloc and PQ 'Out of Touch': Defeated Candidate Denounces the Positions of the Two Sovereignist Parties ». It read, in part:

> [TRANSLATION]
>
> In the opinion of France Gagné, the Bloc candidate defeated in the Louis-Saint-Laurent riding on May 2, both the Bloc Québécois and the Parti Québécois are out of touch with the concerns of citizens. Restoring financial health should be the priority, and the ex-candidate and paralympian athlete believes that François Legault and the Coalition pour l'avenir du Québec are the ones who have the firmest grasp of this reality.
>
> . . .
>
> France Gagné does not go easy on the Bloc and the Parti Québécois, two parties for which he has unsuccessfully run as a candidate in recent years.
>
> . . .
>
> It seems as though at a certain point, the political parties drift a bit out of touch and away from what people want. But I could feel the will of the people, and I could hear them say, « Before we start proposing a country, can we clean up our public finances?
>
> [Reproduction in full.]

11    Gagné saw the article in the morning. At the hearing, he stated that he read it several times, found it instructive, and thought that it had a catchy headline.

12    After reading it, he decided to share the content on Facebook, where he has an account. Accordingly, shortly before 10 a.m., he posted the title, the first lines, and a link to the article.

13    At the time, he had 4,200 « Facebook friends », including the defendant Scott McKay. The excerpt from Gagné's « Facebook page » on July 11 and 15, 2011, filed in defence (exhibit D3), shows that it received 129 comments, some of them positive, others less so:

> • 125 on July 11 between 10 a.m. and 11:44 p.m.
>
> • 4 on July 15 between 11:05 a.m. and 11:58 p.m.

The excerpt filed by the plaintiff (exhibit P11) shows eight more comments made on July 11, four on July 12, eight on July 13, and three on July 14.

14    They were posted by thirty-two individuals. With the exception of Gagné, they are all designated by their initials. Gagné commented thirty-two times, his spouse E.T. twenty-five times, and a certain C.L. thirty-six times. The three of them together were responsible for ninety-three of the one hundred and fifty-two comments.

15    McKay, who was a Member of the National Assembly for the Parti Québécois at the time, read the article shortly after noon. Around 12:15 p.m., he reacted by posting the following comment on the Twitter social network, where he has an account (exhibit P-5):

[TRANSLATION]

France Gagné is out of touch: by renouncing our Nation, you are as much of a traitor as Trudeau's liberals. Ugh!!!

15    and on Gagné's Facebook page, he posted the twenty-second comment, stating the following (exhibit D-3):

[TRANSLATION]

France, speak for yourself! With your PFL (Parti François Legault), you're the one who's out of touch! You're flirting with him right now because you think he is going to win... By renouncing our Nation, you are as much of a traitor as Trudeau's liberals. Ugh!!! This is going to backfire on you!

[Reproduction in full.]

16    A message on Twitter, posted at 1:37 p.m. that same day by a certain P.M., indicates that the comment was deleted (exhibit P-11):

[TRANSLATION]

S.C. _ McKay deletes his *tweet* against @France Gagné.

17    Only a few people shared their reaction to McKay's comment on Gagné's Facebook page (exhibits D-3 and P-11):

<u>July 11, 2011</u>

12:17 p.m. - France Gagné: « traitor » is strong language . . .



1

If you had at least taken the time to read, Mr. McKay, I said that Quebec owes it to itself to become a country, but it has to clean house first.

...

2:30 p.m. - J.B.: Take it easy! Gagné has always defended Quebec and he will continue to do so. The word traitor does not apply to him! He has proudly competed on behalf of Quebec for over twenty years. Show some respect, please.

   2 :31 p.m. - France Gagné: I am still waiting for an apology from Mr. McKay.

...

   2 :59 p.m. - .S.D.: I may not agree with your decision to join forces with Mr. Legault, but respect is still called for. Calling you a « traitor » goes way overboard. I believe Mr. McKay should retract it... This is the kind of reaction that will sink the sovereignist movement!

   3 :00 p.m. - France Gagné: « Bridge to Scotty.

   3 :06 p.m. - E.T.: Well said, Mr. D., even if there is a difference of opinion, it's sad to see how insulting people can be. A grade one student would have more judgment than Mr. McKay. Heckling from the peanut gallery.

...

   4 :40 p.m. - France Gagné: Hey, McKay, that apology . . . I'm still waiting

...

> 5:11 p.m. - France Gagné: McKay has deleted the comment where he says that I am a « traitor

...

> 5:37 p.m. - G.G.: France, I support you. All you did was express yourself. Insults lead nowhere.

7:30 p.m. - B.T.: I don't know, but if talking about responsible government makes you a traitor, I can't imagine what it takes to not be a one...

...

> 7:47 p.m. - B.T.: It's a slanderous accusation, it's extremely serious.

...

8:12 p.m. - M.B.: I will continue to support you as an individual because you remain true to your convictions, including taking responsibility for your opinions. What is more, you are entirely correct, your personal journey and your involvement testify to the kind of person you are, as well as your perseverance and loyalty. Don't dwell on this kind of accusation, your cv speaks for you!!!

...

8:54 p.m. - D.M.: @PMQc@Sc_McKay@FranceGagne Traitor to the Nation and to think that he hasn't even renounced his sovereignist convictions.

<u>July 12, 2011</u>

(Before 8:30 a.m.) T.G.: Mr. Gagné, I have crossed paths with you several times. I am against the fact that Scott McKay called you a traitor. Frankly, however, your about-face is disappointing. Having spent a bit of time with you during certain PQ events, I would say that it doesn't surprise me. You are a careerist and place your own interests above those of Quebec. All you want is to be elected....but you have lost your bid three times. You know that for every election, the PQ and BQ would like to run a different candidate ... to me you're nothing but a loser. While McKay shouldn't say it... I, a mere citizen, do not hesitate to do so... you really are a traitor, no better than the federalists. Careerists out of the PQ!

8:31 p.m. - B.B.: I don't like the last comment, individuals have the right to ask questions.

...

<u>July 14, 2011:</u>

11:46 p.m. - A.G.: The problem won't be solved by pushing sovereignty aside! This so-called sovereignist Legault, a traitor and careerist, totally disappointing on your part, you will never have my vote if you run as a candidate, I hate traitors.

> [Reproduction in full.]

18   In the early afternoon, journalist Gilbert Lavoie from the newspaper Le Soleil posted the title [TRANSLATION] « France Gagné's got the blues" on his blog with a link to the full version of his colleague Luc Fournier's article, which had been published that morning. He did not refer to what McKay had written on the two social media sites. He received fifty-five comments between 1:35 p.m. on July 11 and 9:32 a.m. on July 13. Only one referred to McKay's comment, saying that he had deleted his message. This comment was from P.M. and was made at 3:14 p.m. on July 11 (exhibit P-6):

> [TRANSLATION]

> Just to point out that France Gagné has not renounced his sovereignist convictions but instead the out-of-touch strategy of the Bloc as well as that of the PQ, which is nothing more than a carbon copy.

> On Twitter, the PQ MNA for l'Assomption called him a « traitor to the nation », <u>a message that he has just deleted</u>. Evidently, the PQ and its supporters do not seem to fully comprehend what happened on May 2. They have not understood that

Quebecers have rejected the use of this type of accusatory and contemptuous language against those who do not think the way they do.

[Emphasis added.]

19     Another journalist, Simon Boivin, published an article on the subject in the newspaper Le Soleil at 4:15 p.m., entitled [TRANSLATION] « Scott McKay accuses France Gagné of being a traitor ». In it, he described Gagné's criticism, reported McKay's comment on Twitter, and added that McKay had allegedly mocked Gagné by saying (exhibit P-6):

[TRANSLATION]

The PQ prioritizes public finances, but France Gagné doesn't even know how to spell it, » mocked Mr. McKay, who believes that the former candidate is flirting with François Legault because he thinks Legault « is going to win.

20     He then wrote the following about Gagné and McKay's respective reactions (exhibit P-6):

[TRANSLATION]

The person at the centre of the storm believes that the MNA's comments are « very inappropriate and very unfortunate ». Gagné believes that McKay went « too far » and that he should apologize. « It was a lack of judgment on his part, » he says.

...

As for McKay, the most he acknowledges is that he « went a bit too far.

21     The next day, on July 12, 2011, journalist Gilbert Lavoie published an article in Le Soleil with the following title: « Treachery or post-partum blues? ». He summarized the position expressed by Gagné and wrote the following about McKay's reaction (exhibit P-7):

[TRANSLATION]

**Not very classy, Mr. McKay....**

... And it was not very classy for PQ MNA Scott McKay to accuse his former Bloc ally of being a « traitor. » After all, there have been more serious defections from the Parti québécois.

22     McKay explains that he did not know Gagné personally or know that Gagné was visually impaired when the latter asked to be his Facebook friend.

23     On July 11, 2011, he was experiencing what he described as a [TRANSLATION] « disaster ». Several MNAs had just resigned from his political party, at least one more was planning to do the same, one of his former colleagues was planning to become his political opponent, and a former MP for the Bloc Québécois was, as far as he could tell, getting ready to join forces with his former colleague. For him, [TRANSLATION] « things were going very badly » and he was [TRANSLATION] « extremely worried » about his political party and its goal.

24     He says that when he saw the title of the article by the journalist for Le Soleil, he felt attacked and angered, took no time to think it through, and acted on impulse.

25     He believed that Gagné was joining the nascent Coalition and thus [TRANSLATION] « hindering the cause in a way equivalent to what was done by the MPs in the Trudeau era ». He was referring to the patriation of the Canadian Constitution, which was supported in the House of Commons in December of 1981 by the votes of Quebec MPs, who were referred to as [TRANSLATION] "traitors" by certain spokespersons for the Quebec sovereignty movement at the time.

26     He states that he later realized that he had gone [TRANSLATION] « a bit too far » and [TRANSLATION] « stepped a bit over the line », changed his mind, calmed down and deleted his comments from the two social media networks, Twitter and Facebook. He also cut the connection between himself and Gagné, and consequently did not see the latter's request for an apology.

27    The next day he posted a comment on Twitter that contrasted with the remarks of July 11, 2011, which he describes as [TRANSLATION] « virulent ». His new comment read: [TRANSLATION] « I find it upsetting that opportunist people are ready to renounce everything to join a movement just because it has good numbers in the polls » (exhibit P-13).

28    On September 8, 2011, he was served a demand letter from Gagné, dated August 31, 2011, which concluded as follows:

[TRANSLATION]

Failure on your part to make a public apology via press release to both the written and spoken media along with a letter addressed to our client within 48 hours of receipt of this letter, and to pay $250,000 in damages for injury to reputation within seven (7) days of receipt of this letter will result in our receiving instructions to undertake any and all appropriate judicial proceedings without further notice or delay.

29    He explains that he did not make a public apology immediately. He feared that it would be considered an admission of the merits of the claim.

30    He submits that he had no reason to express any animosity towards Gagné. He simply wanted to convey his disagreement with his opinions.

31    On July 10, 2012, he sent the following letter to Gagné, making it available on his website and Facebook page:

[TRANSLATION]

**Subject: Letter of apology**

Dear Mr. Gagné,

I apologize for the remarks that I published on my blog and on Twitter on July 11, 2011.

I agree that these remarks were exaggerated. That is why I deleted this comment from my site a few minutes later, admitting that I may have gone a little bit too far.

My intention was in no way to do damage to your political career. My comment was in fact made in a context that you are very familiar with, namely, the repeated resignations of important members of the Parti Québécois over the summer of 2011.

I therefore encourage you to remain active within the Parti Québécois and to promote Sovereignty, as you have always done in the past.

Yours sincerely,

32    The information was reported in an article in the Le Soleil newspaper on July 12, 2012, under the title: [TRANSLATION] « France Gagné's Lawsuit: Scott McKay Apologizes... and Defends Himself » in which Richard Hénault, journalist for Le Soleil, summarized the apology as follows:

[TRANSLATION]

Yesterday, Parti Québécois MNA Scott McKay apologized on Facebook to France Gagné, former Bloc Québécois and Parti Québécois (PQ) candidate. At the same time, he filed a defence against the $250,000 lawsuit that Gagné has launched against the Parti Québécois and McKay.

33    Gagné says that he has been dreaming of a political career since 1996. He has taken a few political science classes in university as a way of getting closer to his goal. He was active in the 2005 Parti Québécois leadership campaign in support of Pauline Marois, who later wrote a personal dedication to him in a copy of her 2008 autobiography.

34    He says that between 2006 and 2011, he sold over two thousand membership cards for the Parti Québécois and the Bloc Québécois and raised upwards of $100,000 for the two parties.

35    He had hoped that the leadership of the Parti Québécois would support him and compel compliance with the undertaking that every member of the party supposedly enters into when seeking election. This undertaking can be found in a nomination document and reads as follows:

[TRANSLATION]

In addition, if I am elected at the nomination meeting, I undertake to:

- comply with the statutes and regulations of the Parti Québécois;

- accept the electoral platform of the Parti Québécois;

- never place myself in a conflict of interest in any way whatsoever;

- always be loyal to the Parti Québécois, its leader, its activists, and citizens, all under pain of sanction;

- agree to sign any document relating to the controlling of electoral expenses adopted by the national executive council.

36      Only one press attaché, Éric Gamache, responded to the journalist Simon Boivin, stating that McKay spoke for himself alone and that the Parti Québécois distanced itself from his comments. The journalist published this position in his article, which appeared on July 11 at 4:05 p.m.

37      Gagné was hurt by McKay's comments but, as he stated at the hearing, also by what he qualifies as the indifference of the Parti Québécois.

38      In an out-of-court examination on February 8, 2012, he spoke as follows about his perception of the impact of McKay's comments:

[TRANSLATION]

A You have to understand that I'm a bit of a daring guy and ... uh... a little bit ... I would say pe... perseverant, yes, ... uh... I won my first gold medal on an international level after ... six (6), eight (8) years of competition... uh ... pfff! ... after quite a few competitions.

I had to ... I had to do at least ... uh... because, when I say that I have won two hundred (200) medals, you have to understand that I have been in three hundred and fifty (350) competitions.

When you've been in three hundred and fifty (350) competitions, you've lost a hundred and fifty of them, but I've never given up.

And when I give lectures at schools, that's what I tell the kids: never give up, believe, keep at it, pour your heart into it, you know, do it with ... with emotion.

When you're an athlete, and you represent a country, you shake hands with the Me... Mexican prime minster or ... uh... when it's Juan Antonio Samaranch who gives you your medal, in ninety-two (92), in front of eighty thousand (80,000), ninety thousand (90,000) people, I think that you've done your job, you know, I think that... you're... you're pretty good.

Uh . . . in a few words, there is this guy that comes and destroys everything that... everything that you wanted to do, after your sports career - because, for me, politics was, ultimately, a good way for me to say to people: « Look: the .. the guy who gave you so much, you know, the guy who dedicated himself to you guys, I am offering... I am offering you my time, as an elected representative.

Whether it takes one (1) time, two (2) times, three (3) times, four (4) times, five (5) times, it doesn't matter, I am offering it to you.

I am ready to do it.

What I'm telling you is that Mr. McKay destroyed all of that.

Q: The athletic career?

A: What Mr. Mckay did, you know, um...

Q: Mm-hmm.

A: ... was destroy my happy retirement that I was planing, after my sports career.

Because when I started in politics, I was still an athlete. [1]

39    In addition to his involvement with electoral campaigns, Gagné also refers to his experience in a nomination campaign.

40    In 2006, he sought the Parti Québécois nomination for a riding in an upcoming provincial election. He claims that he was not aware that [TRANSLATION] « people played rough in politics ». He explains that he had sold several membership cards, but that the congress was moved up a few months to August 31, 2006, which was a few days before he had to leave for an international sporting competition. Not all of his supporters were able to vote for him: there was a three-month waiting period before the right to vote was accorded, and fifty-seven membership cards had disappeared. He was defeated.

41    [TRANSLATION] « Politics is a pretty dirty business, thank you very much », he said at the hearing. He states, however, that he decided to rally and be [TRANSLATION] « loyal » to the party. He explains that he met with the winner and negotiated his silence about the way the nomination took place in exchange for the winner's support for his future candidacy for the Bloc Québécois. He describes this as [TRANSLATION] « mutual back scratching".

42    Gagné characterizes McKay's comments as an attack against him. He justifies his claim in the motion to institute proceedings as follows:

*[TRANSLATION]*

> 27. This deliberate, brazen, and gratuitous attack against the plaintiff caused great injury to the plaintiff's reputation as both an athlete and a politician.
>
> 28. Since then, the plaintiff has been insulted by many citizens, be it in the days that followed, while running errands, or during chance meetings on the street.
>
> 29. Also, since these gratuitous remarks by Member of the National Assembly McKay, the plaintiff can no longer run on behalf of the Parti Québécois or Bloc Québécois because no one will trust him now that he has been branded as a traitor;
>
> 30. Any kind of political career is now illusory to the plaintiff, who is compelled give up his political aspirations because of these remarks.

[Reproduction in full.]

43    McKay's response to these allegations can be found essentially in the following paragraphs of his defence:

*[TRANSLATION]*

> 38. The plaintiff himself is the cause of the remarks for which he criticizes the defendant, having decided to grant an interview to the journalist Luc Fournier of the Le Soleil newspaper a few months after his defeat on May 2, 2011, as a sovereignist candidate for the Bloc Québécois in the riding of Saint-Laurent.
>
> ...
>
> 49. It is public knowledge that in June and July of 2011, several Parti Québécois Members of the National Assembly resigned simultaneously in the context of Bill 204 relating to the construction of the amphitheatre in Quebec City, causing a profound unease within the Parti Québécois.
>
> 50. In light of the preceding, it is not at all surprising that the remarks of the plaintiff published on July 11, 2011, fanned the fire.
>
> 51. The defendant was simply reacting to the plaintiff's statements, an entirely normal thing to do in the circumstances.
>
> 52. Just like the plaintiff, the defendant exercised his freedom of opinion and expression by stating that Gagné had exhibited disloyalty to the two sovereignist parties for which he had campaigned;
>
> 53. The opinion of the defendant, who has nevertheless admitted that he went [TRANSLATION] « a bit too far », is also consistent with that of the majority of readers reproduced by the plaintiff himself in his exhibit P-6;
>
> 53.1 In addition, on July 11, 2012, the defendant sent a letter of apology; ...

>   53.2 This letter . . . was published in the Le Soleil newspaper on July 12, 2012, as well as on the defendant's Facebook page and website;...
>
>   54. As for the injury claimed, it is in no way causally related to the so-called defamatory remarks of the defendant. It is also grossly exaggerated.
>
>   55. In reality, the defendant's remarks have no consequence on the plaintiff's athletic career or his political career.
>
>   56. As for punitive damages in the amount of $100,000, they are unlawfully claimed;
>
>   57. The defendant made the remarks for which the plaintiff criticizes him as an entirely legitimate reaction to the latter's statements, not with the aim of injuring him personally.

44   The remarks of both Gagné and McKay were also repeated in other media such as Cyberpresse, lapresse.ca, Canoë inc., and the Radio-Canada and TVA networks.

45   A media technology expert estimates that several million people had the opportunity to become aware of this information. In a report dated March 25, 2013, he explains:

[TRANSLATION]

>   The act of publishing something on a Twitter account triggers a series of stages of information redistribution. This information is subsequently sent to search engines and websites that use it to boost their content. Automatic content generation often takes place with widgets, a type of web tool used to display content from another source. It is all automatically placed at the determined location on the media website.
>
>   [Reproduction in full.]

46   He points out that the act of deleting a « tweet » from an account does not erase the information. In the same report, he writes:

[TRANSLATION]

>   All of the subsites or other sites save the tweet in their databank memories unless a specific request is made from one of their employees to erase it, normally. The same is true with regard to search engines.
>
>   [Reproduction in full.]

47   One witness, however, did a search at the end of May of 2013. Using three Internet search engines - Google, Bing and Yahoo - he found nothing that constituted a « retweet » of McKay's comment.

48   In his motion to institute proceedings, Gagné affirms that he cannot accept McKay's use of the words [TRANSLATION] « traitor » and [TRANSLATION] « out of touch » to describe him, or that McKay [TRANSLATION] « had the audacity to ridicule the plaintiff by claiming that he did not know how to write French ».

49   At the hearing, he added that McKay's use of the interjection [TRANSLATION] « ugh » was a public expression of disdain and contempt towards him.

50   The people in Gagné's inner circle state that they reacted badly to the use of these terms and their publication. His daughter was asked by a few friends whether the person described as a [TRANSLATION] « traitor » was actually her father. His grandparents showed him the article entitled [TRANSLATION] « Scott McKay accuses France Gagné of being a traitor ». His father, however, did not speak about the letter of apology from McKay or of its publication in the Le Soleil newspaper.

51   Gagné's spouse says that she found it [TRANSLATION] « degrading » and goes on to say that [TRANSLATION] « We were in shock ».

52   She confirms that Gagné even thought about returning the medals he had received from the Quebec National Assembly.

53   To explain his allegation that he had been insulted, Gagné related an incident, affirming at the hearing that he [TRANSLATION] « was thrown out » of a meeting of Bloc Québécois members in the Quebec City region in August of 2011. In his out-of-court

examination on February 8, 2012, he was more nuanced, stating that he was addressed at this meeting by someone who asked him to leave, that he was ridiculed by former MNA Michel Guimond, that he remained there nevertheless, and that he took the floor last, when he pointed out that the positions of most of the speakers were similar to his own.[2] He did not identify any other individuals who allegedly insulted him. During the same examination, he also stated:

> [TRANSLATION]
>
> A ... I ... it was even on the radio in Montreal, on 98.5, I don't really know... uh... even in Montreal, they were interested in my case!
>
> That's pretty good![3]

54     When it comes to his sports career, Gagné acknowledges that he could return to it if he continues his training. He nevertheless foresees some difficulty obtaining financial support from sponsors.

55     As for his political career, he believes that it has been seriously compromised. At the hearing, two of his fellow party members who ran electoral campaigns with him in 2008 and 2011 stated that they shared this opinion at the time of the events.

56     They both assigned weight to the word [TRANSLATION] « traitor ». They believe that Gagné did not deserve to be described this way. One of them added that his entourage also believed that [TRANSLATION] « it made no sense ». Both of them attribute Gagné's reaction above all to the fact that it came from a member of the same political family.

**The Applicable Law**

57     Every person has a right to the respect of his reputation. Article 3 *C.C.Q*, the first paragraph of article 35 *C.C.Q.*, and article 4 of the *Charter of human rights and freedoms* provide the following:

> *Civil Code of Québec*
>
> **3. Every person is the holder of personality rights, such as the right to life, the right to the inviolability and integrity of his person, and the right to the respect of his name, reputation and privacy.**
>
> **35.** Every person has a right to the respect of his reputation and privacy.
>
> No one may invade the privacy of a person without the consent of the person unless authorized by law.[4]
>
> *Charter of human rights and freedoms*
>
> **4. Every person has a right to the safeguard of his dignity, honour and reputation.**[5]

58     In their treatise *La responsabilité civile*, authors Jean-Louis Baudouin and Patrice Deslauriers[6] refer to an abundance of case law from which they distill the general principles of law applicable to an action for injury to reputation:

> [TRANSLATION]
>
> *1. Nature of the action*
>
> **1-297** - *Necessity of fault* - For defamation to give rise to an action in damages, its perpetrator must have committed a fault. This fault can result from two types of conduct. The first is conduct in which the defendant, knowingly, in bad faith, and with the intent to harm, attacks the victim's reputation, tries to ridicule, humiliate, or expose the victim to the hatred or contempt of the public or a group. This corresponds to the old notion of delict. The second results from conduct that lacks the intent to harm but where the defendant has nonetheless interfered with the reputation of the victim through his or her recklessness, negligence, impertinence or carelessness. This corresponds to a quasi-delict. Both kinds of conduct incur liability and entitle the victim to reparation, and there is no difference between from a legal standpoint. In other words, we must rely on the ordinary rules of civil liability and resolutely abandon the false idea that defamation can result only from an act of bad faith with intent to harm. These principles, however, do not justify finding that incivility

and rudeness constitute faults in all circumstances because the courts [TRANSLATION] « are not guardians of good manners or taste ». ... , when the publication has no goal other than to injure the victim, it undoubtedly constitutes defamation. ...in other words, one cannot hide behind the right to freedom of expression when one's sole objective is to harm another person.

...

**1-301 - Assessment of the fault** - The assessment of the fault is naturally left to the discretion of the courts and remains a question of fact and circumstances. In this respect, the case law uses the « reasonable person » test, which must be distinguished from that of the « ordinary person » in two respects. First, the tests are used at different stages: the « reasonable person » test is applied when assessing the fault, while the « ordinary person » is referred to when analyzing the existence of an injury and therefore of its perception. Second, the analyses in accordance with these two standards differ from each another. On the one hand, the « reasonable person » test considers conduct from the perspective of an informed, diligent, person who is attentive to the rights of others. The Court must consider whether a reasonable person would have acted in the same way. On the other hand, the « ordinary person » test is a kind of representation of society and its perception of the injury, which requires courts to consider whether an ordinary person would have less respect for the victim as a result of the comments.

**I-302 - Specific circumstances** - Public persons, such as political figures, may expect to be attacked more frequently than others, and tolerance of insults should therefore be greater in their case. They nevertheless retain the right to safeguard their reputation, and attacks against them are unacceptable if they are based on facts that are inaccurate or not a matter of public interest. ... The court must also take into account the context in which the insult was offered or the defamation occurred. In particularly lively exchanges, courts will sometimes accept the « compensation » of insults or the defence of provocation, on the condition that, with respect to the former, the exchange was simultaneous and, with respect to the latter, the insult arising from the provocation was uttered spontaneously. Another important factor in the assessment of the fault is the effect that the injury produced or was intended to produce. . . .

59      *Prud'homme v. Prud'homme*[7] is a leading Supreme Court case on defamation. The following excerpts are relevant here:

> 34 Whether remarks are defamatory is determined by applying an objective standard (*Hervieux-Payette v. Société Saint-Jean-Baptiste de Montréal*, [1998] R.J.Q. 131 (Sup. Ct.), at p. 143, reversed on other grounds by *Société Saint-Jean-Baptiste de Montréal v. Hervieux-Payette*, [2002] R.J.Q. 1669 (C.A.)). In other words, we must ask whether an ordinary person would believe that the remarks made, when viewed as a whole, brought discredit on the reputation of another person. On this point, we should note that words may be defamatory because of the idea they expressly convey, or by the insinuations that may be inferred from them. In *Beaudoin v. La Presse Ltée*, [1998] R.J.Q. 204 (Sup. Ct.), at p. 211, Senécal J. provided a good summary of the approach to be taken in determining whether particular remarks are defamatory in nature:

> [TRANSLATION] "The form in which the libel is expressed is of little import; it is the result achieved in the mind of the reader that creates the delict." The defamatory allegation or imputation may be direct, or it may be indirect, "by simple allusion, insinuation or irony, or be made conditionally, as an expression of doubt, or hypothetically." Often, the allegation or imputation "is conveyed to the reader by way of a simple insinuation, an interrogative sentence, a reference to a rumour, mention of information that has infiltrated the public awareness, juxtaposition of unrelated facts that, together, take on the appearance of being related".

> The words must also be interpreted in their context. For instance, « it is not possible to isolate a passage from a text and complain of it, if the entire text sheds a different light on that excerpt ». On the other hand, « it matters little that the elements of which it is composed are true if the text as a whole conveys a message that is contrary to reality ». In fact, truth or reality may be distorted by half-truths, selective compilation, omissions, and so on. « We must consider a

newspaper article or radio broadcast as a whole, and the sentences and words must be interpreted by reference to one another.

...

38 In every case, determining fault is a contextual question of fact and circumstances. On this point, it is important to note that an action in defamation involves two fundamental values: freedom of expression and the right to reputation. This Court has long recognized the importance of the first of those values in a democratic society. In *Reference re Alberta Statutes*, [1938] S.C.R. 100, at pp. 145-46, Cannon J. explained that freedom of expression was a necessary prerequisite for the proper function of our parliamentary institutions:

Freedom of discussion is essential to enlighten public opinion in a democratic State; it cannot be curtailed without affecting the right of the people to be informed through sources independent of the government concerning matters of public interest. There must be an untrammelled publication of the news and political opinions of the political parties contending for ascendancy. . . . Democracy cannot be maintained without its foundation: free public opinion and free discussion throughout the nation of all matters affecting the State within the limits set by the criminal code and the common law.

39 With the advent of the *Canadian Charter of Rights and Freedoms* ("*Canadian Charter*"), this Court has frequently reiterated the crucial role of freedom of expression. In *Edmonton Journal v. Alberta (Attorney General)*, [1989] 2 S.C.R. 1 326, for example, Cory J. said, at p. 1336, that it was "difficult to imagine a guaranteed right more important to a democratic society than freedom of expression". See also *Ford v. Quebec (Attorney General)*, [1988] 2 S.C.R. 712, at p. 767; I*rwin Toy Ltd. v. Quebec (Attorney General)*, [1989] 1 S.C.R. 927, at pp. 968-69; *R. v. Keegstra*, [1990] 3 S.C.R. 697, at pp. 763-64; *Committee for the Commonwealth of Canada v. Canada*, [1991] 1 S.C.R. 139, at pp. 171-77; *R. v. Zundel*, [1992] 2 S.C.R. 731, at p. 752; *Libman v. Quebec (Attorney General)*, [1997] 3 S.C.R. 569, at paras. 28-29; *Thomson Newspapers Co. v. Canada (Attorney General)*, [1998] 1 S.C.R. 877, at para. 92; *R. v. Sharpe*, [2001] 1 S.C.R. 45, 2001 SCC 2, at para. 23; *R. v. Guignard*, [2002] 1 S.C.R. 472, 2002 SCC 14, at paras. 19-20.

...

41 In addition, this Court has often stressed that political discourse is central to the constitutional guarantee of freedom of expression *(Thomson Newspapers*, *supra*; *Sharpe*, *supra*; *Guignard*, *supra*). In *Keegstra*, *supra*, at pp. 763-64, Dickson C.J. said, inter alia:

The connection between freedom of expression and the political process is perhaps the linchpin of the s. 2(*b*) guarantee, and the nature of this connection is largely derived from the Canadian commitment to democracy. Freedom of expression is a crucial aspect of the democratic commitment, not merely because it permits the best policies to be chosen from among a wide array of proffered options, but additionally because it helps to ensure that participation in the political process is open to all persons.

...

43 That freedom of speech is not absolute. It is limited by, *inter alia*, the requirements imposed by other people's right to the protection of their reputation. As Cory J. observed in *Hill v. Church of Scientology of Toronto*, [1995] 2 S.C.R. 1130, at para. 108, reputation is an attribute of personality that any democratic society concerned about respect for the individual must protect: As Cory J. observed in *Hill*, reputation is an attribute of personality that any democratic society concerned about respect for the individual must protect.

Democracy has always recognized and cherished the fundamental importance of an individual. That importance must, in turn, be based upon the good repute of a person. It is that good repute which enhances an individual's sense of worth and value. False allegations can so very quickly and completely destroy a good reputation. A reputation tarnished by libel can seldom regain its former lustre. A democratic society, therefore, has an interest in ensuring that its members can enjoy and protect their good reputation so long as it is merited.

44 The right to reputation is also protected, in Quebec, by s. 4 of the *Charter of Human Rights and Freedoms* and by art. 3 *C.C.Q.* As well, although it is not specifically mentioned in the *Canadian Charter*, the good reputation of the individual represents and reflects the innate dignity of the individual, a concept which underlies all the *Canadian Charter* rights (*Hill*, *supra*, at para. 120).

60 In *Bou Malhab v. Diffusion Métromédia CMR inc.*,[8] the Supreme Court noted:

[TRANSLATION]

> [22] In Quebec, there is no specific form of action for punishing defamation. Actions in defamation come under the general system of civil liability established in art. 1457 *C.C.Q.* The plaintiff is entitled to compensation if fault, injury and a causal connection are all present. Fault is determined by looking at the defendant's conduct, while injury is assessed by looking at the impact of that conduct on the victim, and a causal link is established where the decision maker finds that a connection exists between the fault and the injury. This is an area of law where it is important to make a clear distinction between fault and injury. Proof of injury is not a basis for presuming that a fault was committed. Proof that a fault was committed does not, without more, establish the existence of a compensable injury.
>
> [23] ...The general principles of civil liability still serve as a starting point for awarding compensatory damages for interference with a right ...
>
> [24] Generally speaking, fault is conduct that departs from the standard of conduct of a reasonable person.... It should be noted that the concept of a reasonable person is normative in nature rather than descriptive. It refers to the way an informed person would behave in the circumstances. Despite the importance attached by the *Quebec Charter* to the protection of individual rights, conduct that interferes with a right guaranteed by the *Charter* does not necessarily constitute civil fault.... The interference must also violate the objective standard of conduct of a reasonable person under art. 1457 *C.C.Q.*, and there must be nothing else that limits the finding on fault, for example the existence of immunity ... or the consideration of competing rights such as freedom of expression.
>
> ...
>
> [26] The type of injury that defines defamation is damage to reputation. In our law, damage to reputation is assessed objectively, from the perspective of an ordinary person... .
>
> [27] This level of analysis is justified by the fact that damage to reputation results in a decrease in the esteem and respect that other people have for the person about whom the comments are made. Therefore, the maker of the comments and the person about whom they are made are not the only ones involved. A person is defamed where the image reflected back to the person by one or more other people is inferior not only to the person's self-image but above all to the image the person projected to "others" in the normal course of social interaction. . . .
>
> [28] It is the importance of "others" in the concept of reputation that justifies relying on the objective standard of the ordinary person who symbolizes them. Therefore, the fact that a person alleging defamation feels humiliated, sad or frustrated is not a sufficient basis for an action in defamation. In such an action, injury is examined at a second level focussed not on the actual victim but on the perceptions of other people. Injury exists where "an ordinary person . . . believe[s] that the remarks made, when viewed as a whole, brought discredit on the reputation" of the victim (*Prud'homme*, at para. 34). However, care must be taken to avoid shifting the analysis of injury to a third level by asking, as the majority of the Court of Appeal seems to have done (at para. 73), whether an ordinary person, acting as a trier of fact, would have found that the victim's reputation was discredited in the eyes of a public that was likely to believe Mr. Arthur's comments. The judge must instead focus on the ordinary person, who is the embodiment of "others".
>
> [29] There are definite advantages to relying on the objective standard of the ordinary person. Bich J.A. described them well in her reasons:

[TRANSLATION] [This standard] has the advantage of not making the characterization of the impugned comments, and thus the determination of injury, dependent on the purely subjective emotions or feelings of the person who has allegedly been defamed. If comments could be shown to be injurious simply by referring to one's feeling of personal upset, humiliation, mortification, vexation, indignation or sadness or to the fact that one's sensibilities or feelings have been offended, hurt or even trampled on, little would be left of freedom of opinion and expression. The very concept of defamation would also become entirely dependent on the particular emotions of each individual. [para. 40]

[30] My discussion of fault demonstrates how reliance on an objective standard is nothing new. In fact, the ordinary person is the counterpart, for injury, of the reasonable person used to assess fault. While both concepts are objective, they are not one and the same. The conduct of the reasonable person establishes a standard of conduct whose violation constitutes a fault. The ordinary person, by contrast, is the embodiment of the society that receives the impugned comments. Injury is therefore assessed through the eyes of this ordinary person who receives the impugned comments or gestures.

[31] The judge responsible for assessing fault requires the person who uttered the words to behave the way that a reasonable person would have behaved in the circumstances. In defamation cases, the judge takes account of that person's right to freedom of expression, and will even accept, in some cases, that the person has expressed exaggerated opinions. In assessing injury, the judge also considers the fact that the ordinary person has accepted that freedom of expression is protected and that exaggerated comments can be made in certain circumstances. However, the judge must also ask whether there is a decrease in the esteem that the ordinary person has for the victim. As a result, even though the standard is an objective one in both cases, it is preferable to use two different terms — reasonable person and ordinary person — because they are concepts that relate to two distinct situations: assessing the conduct and assessing the effect of that conduct from society's perspective. The questions asked at these two stages are different.

61    In *Genex Communications inc. v. Association québécoise de l'industrie du disque, du spectacle et de la vidéo*,[9] the Court of Appeal reiterated:

[TRANSLATION]

[38] . . . . Similarly, the occasion giving rise to the comments must be taken into account. In short, we must bear in mind the entire context in which the comments were made to determine whether they constitute a fault: . . . . As for the purpose of this contextual analysis, it is appropriate to refer to this Court's judgment in *Société St-Jean-Baptiste*, where it affirmed that [TRANSLATION] « the courts are not arbiters in matters of courtesy, etiquette or good taste » (para. 27) ... .

62    In *Calego International inc. v. Commission des droits de la personne et des droits de la jeunesse*,[10] the Court of Appeal wrote the following regarding the racist remarks made by a business executive:

[TRANSLATION]

[49] It is true that over the course of a day, people will make foolish or silly remarks that injure a friend, a colleague, or a neighbour, for example. In all such cases, the person's dignity is violated to some degree. Not every fault, however, results in « nullifying or impairing » the safeguard of the fundamental *Charter* right to dignity, giving rise to an exemplary sanction in the form of punitive damages.

[50] The violation must be truly serious. The threshold is high. Otherwise, the effect is not the safeguard of fundamental rights but the trivialization of the *Charter* and an ill-advised opening of the floodgates to lawsuits seeking payouts.

63    Similarly, in *Confédération des syndicats nationaux v. Jetté*,[11] the Court of Appeal wrote:

[TRANSLATION]

[50] Therefore, I see nothing defamatory in describing the attempted unionization of the appellants as a « trap » or in saying that the CSN has a « belligerent mentality », that it is a « communist stronghold » or a « communizing union » or that it commits abuse by using workers as « cannon fodder ». This was the expression of a viewpoint with which we may well disagree but which on its own is in no way likely to undermine the reputation of the CSN. Daniel Jetté clearly does not agree with the appellants' objective or their way of doing things, and he can certainly state or write his opinion. Disagreement is not defamation. The concept must not be generalized to the point where any controversial or disagreeable remark is considered defamatory, as this would unduly limit individual freedom of expression, which under the *Charter of human rights and freedoms* is exercised both in public and private, with the necessary adjustments in each of those contexts. This freedom requires that even uncivil remarks must be tolerated, provided, however, that they do not cross the line into defamation, since the right to one's reputation is also a fundamental right protected by the *Charter of human rights and freedoms.*

[51] In this case, the line has not been crossed. Daniel Jetté's remarks are undoubtedly harsh, but they express the oppression that he feels as a result of certain incidents in which he claims he was the victim, as well as his disagreement or political or ideological dissidence. It may be strong criticism, but criticism it remains, not defamation.

[52] Furthermore, as the Supreme Court notes in *Prud'homme v. Prud'homme* and *Gilles E. Néron Communication Marketing inc. v. Chambre des notaires du Québec*, the assessment of the defamatory nature of a remark must be contextual. The worlds of management-union relations and inter-union relations are frequent settings for harsh language often veering into excess and hyperbole. In this respect, the trial judgment noted that [TRANSLATION] « belligerent and insinuating language is common currency in the world of the parties » (para. 43). It may be deplored, but it cannot be denied. It is clear from the testimony of Robert Lachance (coordinator of the CSN unionization department) during his examination on affidavit, as well as from his testimony before the trial judge.

[53] It appears that if the appellants take such offence at contentious accusations and name-calling that in other circumstances would have rolled off their backs, it is because these remarks were made by an employee, not an employer or rival association. This gives the remarks more credibility and makes them more likely to suggest to the public that the appellants are oppressing those they are supposed to defend. As Lachance states:

[TRANSLATION]

And in this case, what was perhaps the most disturbing was the fact that it was signed by a worker. For businesses or rival unions to attack us is part of the game, obviously, provided it is a decent and reasonable attack, but when it's from a worker we are supposed to represent and defend, well, that's disturbing because it's intended to mean that we were actually trying to crush honest workers and all that, when that is not at all our objective.

...

[58] As for the word [TRANSLATION] « torturer », while insulting, when it is uttered in a context where he is an employee (that is, in a letter addressed to the appellant Fréchette), it cannot be considered to be defamatory, that is to say, likely to undermine the reputation of the appellant Fréchette by causing him to lose the esteem or consideration of others or by prompting unfavourable or unpleasant feelings toward him, to paraphrase the Supreme Court in *Prud'homme v. Prud'homme*, citing in this respect remarks made in *Radio-Canada v. Radio Sept-Îles Inc.*

[59] Indeed, it would be impossible for anyone to imagine the appellant Fréchette ever being a torturer, according to the primary meaning of the word - in other words, someone who deliberately inflicts physical or psychological pain on a defenceless victim. And even if the word is taken figuratively, again I cannot see how an ordinary person (that is, a reasonable and well-informed person who is neither fastidious nor overly sensitive) could see this case as involving

anything other than a kind of inconsequential exaggeration. In the circumstances, the mere fact that the appellant Fréchette was hurt is not sufficient to assign the term a defamatory meaning.

[Citations omitted.]

64      Gagné also claims punitive damages. On this subject, in *Fédération des médecins spécialistes du Québec v. Conseil pour la protection des malades*, [12] the Court of Appeal wrote:

[TRANSLATION]

[121] The awarding of punitive damages obeys specific rules that do not fall within the purview of the ordinary civil liability regime.

[122] There may be punitive damages only where the law provides. Article 1621 *C.C.Q.* provides the following:

**1621.** Lorsque la loi prévoit l'attribution de dommages-intérêts punitifs, ceux-ci ne peuvent excéder, en valeur, ce qui est suffisant pour assurer leur fonction préventive.

Ils s'apprécient en tenant compte de toutes les circonstances appropriées, notamment de la gravité de la faute du débiteur, de sa situation patrimoniale ou de l'étendue de la réparation à laquelle il est déjà tenu envers le créancier, ainsi que, le cas échéant, du fait que la prise en charge du paiement réparateur est, en tout ou en partie, assumée par un tiers.

**1621.** Where the awarding of punitive damages is provided for by law, the amount of such damages may not exceed what is sufficient to fulfil their preventive purpose.

Punitive damages are assessed in the light of all the appropriate circumstances, in particular the gravity of the debtor's fault, his patrimonial situation, the extent of the reparation for which he is already liable to the creditor and, where such is the case, the fact that the payment of the damages is wholly or partly assumed by a third person.

...

[124] A person's dignity is a protected right under the *Charter of human rights and freedoms*. Unlawful interference with a protected right gives rise to compensation for the resulting moral or material prejudice. This is set out in sections 4 and 49 of the *Charter of human rights and freedoms*:

**4.** Every person has a right to the safeguard of his dignity, honour and reputation.

**49.** Une atteinte illicite à un droit ou à une liberté reconnu par la présente Charte confère à la victime le droit d'obtenir la cessation de cette atteinte et la réparation du préjudice moral ou matériel qui en résulte.

En cas d'atteinte illicite et intentionnelle, le tribunal peut en outre condamner son auteur à des dommages-intérêts punitifs.

**4.** Every person has a right to the safeguard of his dignity, honour and reputation.

**49.** Any unlawful interference with any right or freedom recognized by this Charter entitles the victim to obtain the cessation of such interference and compensation for the moral or material prejudice resulting therefrom.

In case of unlawful and intentional interference, the tribunal may, in addition, condemn the person guilty of it to punitive damages.

[125] Aside from any moral or material prejudice, the second paragraph of section 49 of the *Charter* provides that, in the event of intentional interference, the perpetrator may also be condemned to pay punitive damages.

[126] Punitive damages remain exceptional and such awards must be provided for by law (article 1621, para. 1 *C.C.Q.*). Paragraph 2 of section 49 of the *Charter of human rights and freedoms* provides for punitive damages when the interference is not only unlawful but also intentional.

[127] In addition, as the Supreme Court has recently reiterated, an award of punitive damages « aims at expressing special disapproval of a person's

conduct ». In *de Montigny v. Brossard (Succession)*, the Supreme Court identified three objectives of punitive damages: punishment, deterrence, and denunciation. The trial judge was therefore correct to emphasize the objective of denunciation.

[128] In *Québec (Public Curator) v. Syndicat national des employés de l'hôpital St-Ferdinand*, L'Heureux-Dubé J. explained that the result of the interference must be intentional, but not the fault. In her view, it is necessary to « resist » the temptation to compare the concept of « unlawful and intentional interference » under the *Charter* to the traditionally recognized concepts of « gross fault » or even « intentional fault ».

[129] The following is an oft-cited passage from that case on the test for unlawful and intentional interference.

121. Consequently, there will be unlawful and intentional interference within the meaning of the second paragraph of s. 49 of the *Charter* <u>when the person who commits the unlawful interference has a state of mind that implies a desire or intent to cause the consequences of his or her wrongful conduct, or when that person acts with full knowledge of the immediate and natural or at least extremely probable consequences that his or her conduct will cause</u>. This test is not as strict as specific intent, but it does go beyond simple negligence. Thus, an individual's recklessness, however wild and foolhardy, as to the consequences of his or her wrongful acts will not in itself satisfy this test.

**Decision**

65      The application of the legal principles governing actions in defamation to the facts of this case leads to the conclusion that Gagné has not shown on a balance of probabilities that McKay committed a fault causing him prejudice or that McKay is liable for punitive damages.

66      Gagné is not a political neophyte. He has been involved in politics in a number of capacities, including as a candidate, in several election campaigns.

67      He was aware of the prevailing political context when he granted an interview to a journalist. He was not unaware that the journalist would publish what he said. He agreed with the journalist's interpretation of what he said during their interview. He hoped that his comments would be published as widely as possible. He made them available on Facebook. He wanted to spark a debate.

68      McKay reacted quickly and forcefully. He used words with negative connotations. He threw the qualifier [translation] "out of touch", which Gagné had himself used, back in Gagné's face. He expressed his disgust and the aversion that Gagné provoked in him by writing [TRANSLATION] « ugh! ».

69      To paraphrase the Court of Appeal in *Confédération des Syndicats nationaux v. Jetté*, [13] these remarks may be described as uncivil, but they do not cross the line into defamation.

70      The words [TRANSLATION] « traitor » and [TRANSLATION] « nation », which McKay used in conjunction in a specific context, also do not cross the line.

71      Gagné's former spouse from Latin America suggests that if she had been considered a [TRANSLATION] « traitor to the nation » in her home country, she probably would not be able to return without risking her safety. We are not in that country, however.

72      Éric Gamache, university graduate, press attaché for the parliamentary wing of the official opposition in July of 2011, and ministerial chief of staff when he testified at the hearing, provides a rather broad definition of this expression, stating that [TRANSLATION] « to be a traitor to the nation is to 'flirt' with the federalist option ».

73      Based on inferences that may be drawn from the evidence adduced at trial, a majority of Québécois have at least [TRANSLATION] « flirted with the federalist option ». This would make them all [TRANSLATION] « traitors to the nation ».

74      In *Société St-Jean-Baptiste de Montréal v. Hervieux-Payette*, [14] the Court of Appeal analyzed comments made by the appellant and published in a daily newspaper that described the Quebec MPs in the House of Commons as traitors, among other things. The majority of the Court dismissed the action in defamation of two of these MPs, writing:

[TRANSLATION]

[27] There is no denying that some politicians and political commentators do not mince words. Whatever the members of this panel may think of the words used in the text cited above, the courts are not arbiters in matters of courtesy, etiquette or good taste. Consequently, it is not desirable for judges to apply the standard of their own tastes to censor commentators, as that would spell the end of criticism in our society.

75   To employ the terms used by the Court of Appeal judgment in *Confédération des Syndicats nationaux v. Jetté*, [15] the words [TRANSLATION] « traitor » and [TRANSLATION] « nation » used in conjunction, as well as [TRANSLATION] « out of touch » and [TRANSLATION] « ugh », taken alone or in the context where they appeared, are undoubtedly harsh. Indeed, McKay has acknowledged this himself. He deleted them from the social media networks to which he had access one hour and twenty-two minutes after posting them. Although he was aggressive in expressing his disagreement with Gagné's political remarks in a newspaper article that the latter posted on Facebook, his remarks remain criticism and do not cross the line into defamation. Gagné has not convinced the Court that a reasonable person informed of the context would conclude any differently.

76   As for injury to reputation, it appears that Gagné took offence to McKay's remarks partly because they came from a member of his political family and partly because the political party to which he devoted himself for many years revealed itself, in his view, to be indifferent to him.

77   In light of Gagné's situation and experience, it is understandable that he was hurt and offended. That is not sufficient, however, to find that there was injury to his reputation.

78   Unlike the situation in *Société St-Jean-Baptiste de Montréal v. Hervieux-Payette*, [16] the reactions of journalists in the newspapers and comments made on social media were entered as evidence on consent of the parties. This evidence may be used to determine whether an ordinary person would find that the remarks brought discredit on Gagné's reputation.

79   Only two people stated that they agreed with McKay's first position. He himself recognized that he [TRANSLATION] « had gone a bit too far ». All of the other witnesses disapproved of his use of the term [TRANSLATION] « traitor ». Publicly, McKay was described as [TRANSLATION] « not very classy ».

80   In sum, although Gagné's feelings were hurt by McKay's comments, from the point of view of an ordinary person, the individual who came out looking the worst is the one who made the remarks in the first place.

81   Moreover, even if a fault on the part of McKay and an injury suffered by Gagné had been demonstrated, the claim for punitive damages would have failed.

82   According to the evidence, very little time passed between the moment McKay read the newspaper article reporting Gagné's position and the moment he reacted. His remarks were not prepared but spontaneous. His reaction was immediate, his comments brief. When he took the time to reconsider his position, he backtracked.

83   If any injury to reputation took place, it was not intentional.

84   Consequently, Gagné's action cannot succeed.

85   The issue of the costs remains.

86   As a rule, the losing party pays costs unless the Court, by a decision giving reasons, orders otherwise (article 477 *C.C.P*). In this case, Gagné's action should be dismissed without costs.

87   Because McKay was a Member of the National Assembly at the time of the facts, he benefits from section 85.1 of the *Act respecting the National Assembly*, [17] and in the event of being found liable might have been protected by the second paragraph of section 85.4 of that statute.

> 85.1. A Member or a former Member is entitled, subject to sections 85.2 to 85.4, to the payment of the defence costs and judicial costs arising out of proceedings brought against the Member or former Member by a third person for any act or

omission in the performance of the Member's or former Member's duties of office.

The Member or former Member is also entitled to the payment of expenses incurred for counsel where the Member or former Member is summoned to appear at an inquiry, a preliminary inquiry or judicial or quasi-judicial proceedings in connection with the Member's or former Member's duties of office.

In each case submitted to it, the Office of the National Assembly may, after obtaining the advice of the jurisconsult appointed under the *Code of ethics and conduct of the Members of the National Assembly* (chapter C-23.1), fix the maximum amount to be paid under the first and second paragraphs.

...

> 85.4. Where, in judgment in a civil suit that has become *res judicata*, a Member or former Member is held liable for damage by reason of an act or omission in the performance of the Member's or former Member's duties of office, no costs or expenses may be paid and the Assembly shall recover any costs or expenses paid if the Office, after obtaining the advice of the jurisconsult, is of the opinion that the Member or former Member acted in bad faith.

The Assembly shall, however, assume the payment of any pecuniary penalty arising out of a judgment in a civil suit, except where the Office, after obtaining the advice of the jurisconsult, is of the opinion that a gross fault was committed by the Member or former Member or that the judgment should be appealed by the Member or former Member.

88   The Office of the National Assembly will no doubt agree that a four-time recipient of a medal from the National Assembly should be exempted from reimbursing the part of the fees and judicial costs he might be ordered to pay.

88

89   *DISMISSES* the action in defamation brought by France Gagné against Scott McKay.

90   Without costs.

| Footnotes | | |
|---|---|---|
| 1 | | Transcript from the examination, February 8, 2012, at 168, line 6 to 170, line 7. |
| 2 | | *Supra* note 1 at 104-105. |
| 3 | | *Supra* note 1 at 111, lines 18-22. |
| 4 | | *Civil Code of Québec*, L.R.Q., c. C-1991. |
| 5 | | *Charter of human rights and freedoms*, C.Q.L.R., c. C-12. |
| 6 | | Jean-Louis Baudouin & Patrice Deslauriers, *La Responsabilité civile*, 8th ed. (Cowansville: Yvon Blais, **2014**). |
| 7 | | *Prud'homme v.* Prud'homme, 2002 SCC 85. |
| 8 | | *Bou Malhab v. Diffusion Métromédia CMR inc.,* , 2011 SCC 9. |
| 9 | | *Genex Communications inc. v. Association québécoise de l'industrie du disque, du spectacle et de la vidéo,* , 2009 QCCA 2201. |
| 10 | | *Calego International inc. v. Commission des droits de la personne et de la jeunesse,* 2013 QCCA 924. |
| 11 | | *Confédération des syndicats nationaux v. Jetté,* , 2005 QCCA 1238, leave to appeal to S.C.C. refused (S.C.C.,2006-05-18), 31314. |
| 12 | | *Fédération des médecins spécialistes du Québec v. Conseil pour la protection des malades,* , **2014** QCCA 459. |
| 13 | | *Supra* note 11. |

| | |
|---|---|
| 14 | *Société St-Jean-Baptiste de Montréal v. Hervieux-Payette,* , [2002] R.J.Q. 1669, leave to appeal to S.C.C. refused, (S.C. Can., 2003-05-12), 29532. |
| 15 | *Supra* note 11. |
| 16 | *Supra* note 14. |
| 17 | *Act respecting the National Assembly*, R.S.Q., c. A-23.1. |

---

**End of Document**  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Westlaw. © 2016 Thomson Reuters   |   Privacy Statement   |   Accessibility   |   Supplier Terms   |   Contact Us   1-800-REF-ATTY (1-800-733-2889)   |   Improve Westlaw    THOMSON REUTERS